KERLIN v. CITY OF DEVILS LAKE, Peter J. McClory, as Mayor of the City of Devils Lake; and S. C. Jones, as City Auditor of the City of Devils Lake.

(141 N. W. 756.)

A special city election was held to determine the question of whether such city would increase its debt limit and issue bonds to establish a city light plant. The election was held at one central voting place, instead of having a

Note.—The authorities on the question of registration as condition of right to vote are reviewed in notes in 25 L.R.A. 480, and 90 Am. St. Rep. 57. See also note in 23 Am. Dec. 642.

And on the question of the submission to the voters of a municipal corporation

place for voting in each ward as an election precinct as required by statute. The place of election was where city special elections for years had usually been held. A large vote was polled for a special election. Ample opportunity was afforded all electors to vote. No fraud is alleged in the calling of or in the conduct of the election. *Held:*—

### Special city election — ward — time — place — fraud — irregular.

(1) As by statute an election should have been held in each ward, the election was irregular, but not void.

### Constitution — election — qualifications — precinct.

(2) Section 121 of our Constitution, as amended, in defining the qualifications of an elector, does not prescribe a rule for voting, nor compel a qualified elector to necessarily vote at a place within the boundaries of the ward in which he resides, though every ward is by statute a voting precinct.

### Election — canvass and return — votes — statute — valid.

(3) Where the election is held as called for, at the place designated by the lawful municipal authority, and is regularly conducted, and a fair and regular canvass and return made of all votes cast, with no fraud charged, in the absence of a statute expressly invalidating the election, it will be upheld.

### Registration — city elections.

(4) General statutory registration requirements do not apply to a special city election held for this purpose; the details of registration are to be provided for by municipal ordinance.

### Fraud — illegal voting — registration.

(5) Want of registration at this special election did not invalidate such election, in the absence of fraud or of a charge of illegal voting sufficient to change the result.

### Election — illegal voting — result — fraud — pleading.

(6) An allegation that certain named persons illegally voted at such elec-

---

as a single question of several purposes or objects, the above case seems to be in harmony with Hamilton v. Detroit, 83 Minn. 119, 85 N. W. 933, where a proposition submitted to the voters of a village for the establishing of an electric light plant and the payment therefor by bonds was held not invalid as embodying two distinct propositions. Holding to the same effect are Thompson Houston Electric Co. v. Newton, 42 Fed. 723 (erecting electric plant and issuing bonds in payment thereof); People ex rel. Atty. Gen. v. Caruthers School Dist. 102 Cal. 184, 36 Pac. 396 (buying of lot and building of schoolhouse, connected with issuance of bonds or voting of tax); Seymour v. Tacoma, 6 Wash. 138, 32 Pac. 1077 (adoption of a system of waterworks and lighting and incurring of indebtedness therefor). The authorities on the question what objects or purposes may be combined in a single question submitted to the voters of a municipality are gathered in a note in 26 L.R.A.(N.S.) 665.

tion, without charging that it changed the election result, and where insufficient to impute fraud in the conduct of the election, does not charge facts sufficient to invalidate the election.

**Election —official notice.**

(7) The official notice of election by publication was legally given.

**Resolution — ordinance — special election.**

(8) A special election for such purposes may be authorized either by resolution or ordinance.

**Ballots — preparation of — indefinite.**

(9) The ballot, in stating the amount of the proposed bond issue, is too indefinite where the amount is stated as "not to exceed $33,000."

**Dual questions — ballots — voting.**

(10) A dual question of (1) increase in debt limit, and (2) bonding after increase of debt limit, both for a stated purpose, may be submitted upon the ballot at one election if the form of the ballot permits such propositions to be voted upon separately.

**Form of ballots — prejudice — misleading — voters.**

(11) The fact that both of the questions to be voted upon were, under the form of the ballot, submitted jointly instead of separately did not prejudice or mislead the voter as to the question of increasing the debt limit.

**Election — bonds — debt limit.**

(12) Although such election was abortive in so far as it authorized the issuance of bonds, it was valid in so far as it authorized an increase of the debt limit for such purposes.

Opinion filed April 26, 1913.

An appeal from the District Court for Ramsey County, *Winchester,* Special J., from an order vacating an injunctional order.
Modified.

*Flynn & Traynor,* for appellant.

The amount of the bonds sought to be voted must be stated definitely in the resolution, notice, and ballot. Stern v. Fargo, 18 N. D. 289, 26 L.R.A.(N.S.) 665, 122 N. W. 403.

There is no distinction between the statements, "not exceeding" and "not to exceed," referring to the amount of the bond, and neither is

25 N. D.—14.

sufficiently definite. Ibid.; State ex rel. Schultze v. Manchester Twp. Committee, 61 N. J. L. 513, 40 Atl. 589; State ex rel. Lexington & St. L. R. Co. v. Saline County Ct. 45 Mo. 242; Dawson v. Dawson Waterworks Co. 106 Ga. 696, 32 S. E. 907; Hillsborough County v. Henderson, 45 Fla. 356, 33 So. 997; Smith v. Dublin, 113 Ga. 833, 39 S. E. 327.

Dual questions, when not naturally related or connected, but relate to two distinct subjects, cannot be submitted to the voters in the form of one question, and such ballot is improper. Stern v. Fargo, 18 N. D. 289, 26 L.R.A.(N.S.) 665, 122 N. W. 403; Hughes v. Horsky, 18 N. D. 474, 122 N. W. 799.

A majority vote means a majority of all the legal voters of a city, whether voting or not. State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 366; State ex rel. Davis v. Fabrick, 18 N. D. 402, 121 N. W. 65, *distinguished.*

There is a distinction between such cases and a case where the proposition is to create a debt against the municipality. Williamson v. Aldrich, 21 S. D. 13, 108 N. W. 1063; State ex rel. Clark v. Stakke, 22 S. D. 228, 117 N. W. 129.

The increasing of indebtedness of a city, or the issuing of bonds, must be covered by *ordinance* duly passed and published. N. D. Rev. Codes 1905, §§ 2675, 2676, 2678; Engstad v. Dinnie, 8 N. D. 1, 76 N. W. 292; Roberts v. Fargo, 10 N. D. 230, 86 N. W. 726.

The ballots did not state the questions to be voted upon, *fully* and *fairly,* and the election was, therefore, invalid. N. D. Rev. Codes 1905, §§ 616, 618.

There are four wards in the city of Devils Lake, each a voting precinct, and this election was held in the first ward—none other of the polling places being open. There is no authority for holding any election in such manner. Rev. Codes 1905, §§ 2678, 2980, 8597; Rev. Codes 1905, § 2743, as amended by Sess. Laws 1911, chap. 65; Rev. Codes 1905, § 2744, as amended by Sess. Laws 1911, chap. 66.

It is a general rule that an election held at an improper place is absolutely void, without proof of fraud or injury. 10 Am. & Eng. Enc. Law, 684–691; Perry v. Hackney, 11 N. D. 148, 90 N. W. 483; State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; Whit-

comb v. Chase, 83 Neb. 360, 119 N. W. 673, 17 Ann. Cas. 1090; 15 Cyc. 310; Bean v. Barton County Ct. 33 Mo. App. 635; Territory ex rel. Higgins v. Steele, 4 Dak. 78, 23 N. W. 91; State ex rel. McCarthy v. Fitzgerald, 37 Minn. 26, 32 N. W. 788; Elvick v. Groves, 17 N. D. 561, 118 N. W. 228.

Section 688 of the revised codes does not apply to elections such as the one in this case. Injunction is the proper remedy in cases like the one at bar. Rev. Codes 1905, §§ 605, 698; State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958; State ex rel. Butler v. Callahan, 4 N. D. 481, 61 N. W. 1025; 15 Cyc. 394; Calaveras County v. Brockway, 30 Cal. 325; Rev. Codes 1905, § 738, as amended by Sess. Laws 1911, chap. 128; Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95; Farren v. Buffalo County, 5 Dak. 36, 37 N. W. 756; Const. No. 121, as amended by art. 2, of Amendments; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360; Code 1905, § 2979, as amended by Sess. Laws 1911, chap. 76; Donovan v. Allert, 11 N. D. 289, 58 L.R.A. 775, 95 Am. St. Rep. 720, 91 N. W. 441.

*F. T. Cuthbert,* City Attorney for respondents (*A. R. Smythe,* of counsel).

The resolution, notice, and ballot are sufficiently definite and certain as to *purpose* and *amount* of the bonds to be issued. Stern v. Fargo, 18 N. D. 289, 26 L.R.A.(N.S.) 665, 122 N. W. 403.

A majority vote of those voting is all that is necessary to carry a proposition like that involved in this case. Rev. Codes 1905, § 2678; State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360; Fabro v. Gallup, 15 N. M. 108, 103 Pac. 272; St. Joseph Twp. v. Rogers, 16 Wall. 646, 21 L. ed. 328; Cass County v. Johnston, 95 U. S. 368, 24 L. ed. 417; Carroll County v. Smith, 111 U. S. 556, 28 L. ed. 517, 4 Sup. Ct. Rep. 539; Pacific Improv. Co. v. Clarksdale, 20 C. C. A. 635, 41 U. S. App. 68, 74 Fed. 528; Lamb v. Cain, 129 Ind. 516, 14 L.R.A. 518, 29 N. E. 13; South Bend v. Lewis, 138 Ind. 516, 37 N. E. 986; Taylor v. McFadden, 84 Iowa, 270, 50 N. W. 1070; Montgomery County Fiscal Ct. v. Trimble, 104 Ky. 638, 42 L.R.A. 738, 47 S. W. 773; Shearer v. Bay County, 128 Mich. 556,

87 N. W. 789; Tinkel v. Griffin, 26 Mont. 432, 68 Pac. 859; Davis v. Brown, 46 W. Va. 719, 34 S. E. 839.

The ballots used in this election stated *fully* and *fairly* the question to be voted upon. Leavenworth v. Wilson, 69 Kan. 74, 76 Pac. 400, 2 Ann. Cas. 367, distinguished.

The official newspaper of a city may be designated by resolution of the city council. Rev. Codes 1905, §§ 2677, 2678, 2980; Ordinance No. 59, City of Devils Lake.

The mere fact that there was but one voting place, at this election, amounted at most to an irregularity, and did not render the election void. State ex rel. Brown v. Westport, 116 Mo. 582, 22 S. W. 888; Lebanon Light & Magnetic Water Co. v. Lebanon, 163 Mo. 246, 63 S. W. 809; Davis v. State, 75 Tex. 424, 12 S. W. 957; Bell v. Faulkner, 84 Tex. 187, 19 S. W. 480; Peard v. State, 34 Neb. 372, 51 N. W. 828; Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101; Stemper. v. Higgins, 38 Minn. 222, 37 N. W. 95; Preston v. Culbertson, 58 Cal. 209; Sprague v. Norway, 31 Cal. 173; Farrington v. Turner, 53 Mich. 27, 51 Am. Rep. 88, 18 N. W. 544; Zeiler v. Chapman, 54 Mo. 502; Statutory Notice, See McPike v. Pen, 51 Mo. 63; State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; Perry v. Hackney, 11 N. D. 148, 90 N. W. 483.

An irregularity in an election, which is free from fraud, and which does not affect the result, is harmless, and does not render the election void. Territory ex rel. Sherman v. Mohave County, 2 Ariz. 248, 12 Pac. 730; San Luis Obispo County v. White, 91 Cal. 432, 24 Pac. 864, 27 Pac. 756; Allen v. Glynn, 17 Colo. 338, 15 L.R.A. 743, 31 Am. St. Rep. 304, 29 Pac. 670; Williams v. Shoudy, 12 Wash. 362, 41 Pac. 169; Ackerman v. Haenck, 147 Ill. 514, 35 N. E. 381; Parvin v. Wimberg, 130 Ind. 561, 15 L.R.A. 775, 30 Am. St. Rep. 254, 30 N. E. 790; Sterritt v. McAdams, 99 Ky. 37, 34 S. W. 903; Smith v. Crutcher, 92 Ky. 586, 18 S. W. 521; State ex rel. Waggoner v. Russell, 34 Neb. 116, 15 L.R.A. 740, 33 Am. St. Rep. 625, 51 N. W. 465; People v. Cook, 8 N. Y. 67, 59 Am. Dec. 451; People v. McManus, 34 Barb. 625, 22 How. Pr. 27; People ex rel. Lefever v. Ulster County, 34 N. Y. 273; Hannah v. Shepherd, — Tex. Civ. App. —, 25 S. W. 137; Soper v. Sibley County, 46 Minn. 274, 48 N. W. 1112; Howser v. Pepper, 8 N. D. 484, 79 N. W. 1018; Bowers v. Smith, 111 Mo. 45,

16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101; Farrington v. Turner, 53 Mich. 27, 51 Am. Rep. 88, 18 N. W. 544; Peard v. State, 34 Neb. 372, 51 N. W. 828.

Registration is not necessary to a valid municipal election for special purposes. Madison v. Wade, 88 Ga. 699, 16 S. E. 21; Davis v. Dawson, 90 Ga. 817, 17 S. E. 110; Seymour v. Tacoma, 6 Wash. 138, 32 Pac. 1077; Graves v. Seattle, 8 Wash. 248, 35 Pac. 1079; State ex rel. Kellogg v. Shepherd, 42 Kan. 360, 22 Pac. 428; State ex rel. Eble v. Leavitt, 33 Neb. 285, 49 N. W. 1097.

The fact that such election is held at one general, centrally located polling place, even though there are other precincts in the city, does not invalidate the election. State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955.

Injunctional relief is not proper in this class of cases. Beal v. Ray, 17 Ind. 554; Sanders v. Metcalf, 1 Tenn. Ch. 419.

Goss, J. This is an appeal from an order of the district court of Ramsey county, dissolving an injunctional order and denying a temporary injunction pending suit. It was heard upon the verified complaint and supporting affidavit and exhibits, together with a verified answer and counter affidavits. The proceeding involves the validity of an election, called and held to increase the debt limit and issue bonds in the sum of $33,000 for the purpose of establishing a municipal light plant in the city of Devils Lake. Questions of law alone are presented. The facts are not in conflict. The case naturally divides into two general divisions: (1) Validity or invalidity of the special election; and (2) the election being sustained, what were the results accomplished thereby?

Appellant urges that the election held was void for the reason that the city of Devils Lake at the time of the election, and for some time prior thereto, consisted of four wards, from each of which aldermen were elected, and that each ward constituted an election precinct under the express provisions of § 2743, Rev. Codes 1905, as amended by chapter 65 of the Session Laws of 1911, in force when the election occurred on November 6, 1911. That said city contained a population of over 5,000 people, with approximately 700 legal voters residing therein. That instead of holding an election in each ward, as a several pre-

cinct of said city, the special election for bonding purposes was held at one place at which all the voters of the city desiring to participate were obliged to vote or refrain from voting. The uncontroverted affidavits of the defendants admit that said election, as conducted, was held at the city fire hall, centrally and conveniently located within said city, and that the total vote there cast was 483; that all special elections had for various purposes have always been held at said place since 1885, notwithstanding that the city had been divided into wards in 1887; and that the holding of all special city elections in this building had been customary throughout that time, and that all special and school elections for more than ten years last past have been so held at said place, all the voters in the city casting their ballots at the one central voting place; and that pursuant to that custom this election was so held; that an unusually large vote (483) for a special election was cast; the total vote of the city cast at the last preceding general election was but 595, and the total vote cast at the last previous city election was 609. That said fire hall was sufficiently large, commodious, and convenient to accommodate all the voters, and the facilities provided would have accommodated more than three times as many voters as voted at said election. That the fire hall is practically in the center of said city, and accessible from all parts of the city, and is the usual and customary voting place and precinct of the first ward of the city in general elections, and was a convenient place for the voters of the various other wards of the city to use for such purposes. No fraud in the conduct of said election is alleged, and no prejudice to the right of any voter to exercise his franchise is charged, nor is it claimed that the election had was not a full and fair expression of public opinion on the subject evidenced through the ballot box, 327 votes being cast in favor of increasing the debt limit and the issuance of bonds, to 156 votes cast against the same, the proposition carrying by more than a two-thirds majority.

The question thus confronting us is whether the ignoring of the wards as election precinct lines, and the holding of this election for the whole city at one voting place, voids the election under the above circumstances. If so, this case is determined without considering other matters involved.

There can be no question but what the plain statute, § 2743, Rev.

Codes 1905, in express words provides that each ward of a city "shall constitute an election district" in the case here presented; and, also, "that in city elections separate ballot boxes and poll books shall be provided and kept for each ward." And that "such wards and precincts shall constitute election districts for all state, county, city, and school elections." And we must remember that, aside from the plain intent of the statute as derived from the unambiguous and plain terms of it, the legislature in 1911 amended the prior law, § 2743, Rev. Codes 1905, by adding the above provisions requiring the keeping of separate ballot boxes and poll books for each ward, and also bringing city and school elections under the statute, thereby making the statute operate uniformly upon all elections, state, county, city, and school, and both general and special. There can be no question but what, under the plain statute, it was the duty of the city authorities to provide for and have conducted a polling place at some place within each ward, to comply with the statute quoted. In addition to this, § 121 of our state Constitution, as amended, provided at the time of this election who should vote thereat, by the following constitutional provision: "Every male person of the age of twenty-one years or upwards, . . . who shall have resided in the state one year and in the county six months and in the precinct ninety days, next preceding any election, shall be . . . a qualified elector at such election." The proposition of law thus presented is whether this election is merely irregular, or instead void, when so conducted in disregard of the plain terms of this statute, and any inference bearing thereon to be derived from the above constitutional definition of an elector. At first blush, and from abstract reasoning without a careful investigation of the many adjudications throwing light on the question before us, one would likely conclude that the election was void. But research discloses that the great weight of authority, if not all the authority, is the other way, and that public policy enters into the question. On reasons of public policy, courts have been reluctant to hold elections void except where imperatively necessary from the plain expressed legislative purpose. Thus, where the legislature says, as in registration, that a vote shall not be received from a nonregistered voter, nothing remains to the courts but to give force to the declared legislative intent, and such is our law. See Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95. And where

the court must choose between holding valid or invalidating an entire election, the reason for holding the election valid would be stronger where, as in a case of this kind, an entire city must be disfranchised, than where the ballots of a limited number of persons or even a precinct would be thrown out. If courts hesitate to disfranchise the few, the greater the reason, then, for reluctance in setting aside the expressed will of all by the declaration that a whole election is invalid. Hence we find the rule of law, announced for the application of statutes and the particular constitutional provision before us, in cases similar to this, to be that generally where the statute does not in express terms declare that the election shall be void, or where the constitutional provision does not, by reasonable inference, invalidate the election, the election will be sustained and the violation of statute will be treated as an irregularity, going to the form, instead of to the substance, where, from all the facts, the court does conclude that, in spite of the departure from statutory requirements, a full and fair ballot has been cast and a true and fair return of the entire election has been canvassed and made. Indeed, it has been held that this rule of law is so well established that it should be considered as the common law, controlling in the light of which the statute was enacted, and with which the statute must be interpreted, and affecting its application, unless the statute in express terms negatives it by a declaration that the election held in disregard of the statute shall be void. Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101, where, after referring to the English ballot act of 1872 (35, 36 Vict. chap. 33, § 13), providing that "no election shall be declared invalid by reason of a noncompliance with the rules contained in the first schedule to this act, or any mistake in the use of the forms in the second schedule to this act, if it appears to the tribunal having cognizance of the question that the election was conducted in accordance with the principles laid down in the body of this act, and that such noncompliance or mistake did not affect the result of the election," the Missouri court, commenting thereon, says: "It has been judicially determined in that country that the language just quoted is merely declaratory of the common law of England. Woodward v. Sarsons (1875) L. R. 10 C. P. 751. It . . . goes no further as a curative power than the accepted general principles of the law of elections in this country as expounded by the courts."

The opinion also states: "It has been sometimes said in this connection that certain provisions of election laws are mandatory and others directory. These terms may, perhaps, be convenient to distinguish one class of irregularities from the other. But, strictly speaking, all provisions of such laws are mandatory in the sense that they impose the duty of obedience on those who come within their purview. But it does not, therefore, follow that every slight departure therefrom should taint the whole proceedings with fatal blemish. Courts justly consider the chief purposes of such laws, namely, the obtaining of a fair election and an honest return, as paramount in importance to the minor requirements which prescribe the formal steps to reach that end; and in order not to defeat the main design are frequently led to ignore such innocent irregularities of election officers as are free of fraud and have not interfered with a full and fair expression of the voters' choice. Thus in Davis v. State (1889) 75 Tex. 420, 12 S. W. 957, the law required that each ward in a town should 'constitute an election precinct;' yet in San Marcos, a town incorporated with four wards, the county commissioners established two precincts only (without reference to ward lines), and each included parts of the adjacent country; but the court, after full discussion of the general subject, held that the election at those precincts was not avoided by the irregularity. In Stemper v. Higgins (1888) 38 Minn. 222, 37 N. W. 95, a general election was conducted in the village of Madelia, by its officers, as though it constituted a district separate from the township in which it was situated, where also a precinct was open; whereas the law declared that 'every organized township and every ward of an incorporated city is an election district;' yet the court held the returns from the village valid, despite the irregularity indicated. These cases find support in others, illustrating the same principle." In the main case cited, Bowers v. Smith, instead of voting four precincts or wards at one polling place, the city of Sedalia, which legally constituted one voting precinct, arbitrarily for the convenience of the electors divided the precinct by establishing two polling places instead of one, requiring the electors whose surnames began with the letters "A" to "K" to vote at one, while those included within the letters "L" to "Z" voted at the other; and appointed, without authority of law, an entire set of election officers for the polling place so created without legal sanction. Thus, an additional

polling place, with an entire set of election officers to conduct such election, was thus, for convenience, created. The election was sustained. The case of Davis v. State, supra, was also closely parallel in facts and principle to the case before us. The statutes applying were practically identical with our statute under consideration. The Texas statute provided that "each ward shall constitute an election precinct." The opinion states the facts "that San Marcos had been incorporated and was divided into four wards, and that but two election precincts had been established in the city by the commissioners, and that these were established without reference to the wards, and that they included parts of the surrounding country." The matter was exhaustively considered, a dissent being filed by one justice. The opinion also shows the same constitutional provision entered into the discussion there as here. We quote: "The main design of all election laws is, or should be, to secure a fair expression of the popular will in the speediest and most convenient manner; and we think a failure to comply with provisions not essential to attain that object should not avoid the election, in the absence of language clearly showing that such was the legislative intent. But there is no express declaration in the statute that a failure of the commissioners' courts to make each ward an election precinct shall avoid the election. Nor does it contain any words from which it should be necessarily implied that such was the intention. If such is the meaning of the law, it must be arrived at by construction. It may be conceded that one purpose of the provision was to prevent illegal voting. The constitution required that each voter should vote in his precinct. Hence, the provision that each ward of a town or city should constitute a precinct made it necessary that each voter should cast his vote in the vicinity where, as a general rule, his qualifications to vote were best known. So far it tended to secure the purity of the ballot box. That consideration of public policy may in part . . . have led to the enactment of the statute. On the other hand, it may have been inserted for the convenience of the voters living in incorporated towns and cities. However that may be, there was a more important matter which ought to have been considered by the legislature in inserting the article; namely, the result of making a compliance with it an essential prerequisite of the validity of the election. That result would be to create confusion, to produce litigation, and to bring about the neces-

sity for new elections in cases where the popular will has been fairly expressed. We think this was not intended. It is better to take the chances of a few fraudulent votes being cast, which may or may not change the result, than that an election should be set aside because of the failure of the commissioners' court to do their duty in particulars not affecting the general fairness of the ballot. It may be said that the language of the article is not persuasive merely, but imposes upon the court an imperative duty (in designating polling places). Let it be conceded. It does not follow that a failure to perform the duty makes its action void. . . . It may be said that the use of the word 'shall' shows that the provision is mandatory. That it is a command to the commissioners' court may be granted; but it does not follow that it is mandatory in the sense that it make a compliance with the provisions essential to the legality of the election. The word 'shall' has been frequently construed as not mandatory, when the provision in which it was found did not confer a private right, and the public interest did not demand such construction. . . . We think that when the commissioners' courts have fixed the precincts, and the election has been held, it ought not to be set aside because they have failed to make each ward in a city an election precinct, unless it be shown that they have acted with a fraudulent purpose."

And these cases of Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101, and Davis v. State, 75 Tex. 420, 12 S. W. 957, have both been followed heretofore by this court in State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955, at page 961, and Perry v. Hackney, 11 N. D. 148, 90 N. W. 483, following Miller v. Schallern, 8 N. D. 395, 79 N. W. 865. State ex rel. Byrne v. Wilcox, supra, has committed this court upon the question before us. The facts are closely parallel. It involved an election in which the county commissioners had disregarded ward lines to prevent confusion arising from a portion of the city of Bismarck being in one commissioner district and a part in the other; and where wards had been established without regard to the commissioner districts, the territory in certain wards including territory in both commissioner districts. The county commissioners readjusted the precinct boundaries without regard to the wards, and the question arose whether the election that would be conducted thereafter in the precincts as established by the county commissioners

would be void.   The basis for declining to assume jurisdiction in State ex rel. Byrne v. Wilcox is given in the opinion to be that the election similar to this one would be irregular only, and not void, and hence the franchises of the state could not be affected.   Assuming, without deciding for the purposes of the decision, that a void election would affect them, what is there said cannot then be regarded as *obiter*.   We quote from the opinion in 11 N. D. at page 340, 91 N. W. at page 961: "This court will assume, for the purpose of disposing of the motion to quash, that the precincts attempted to be created by the recent action of the county board were created without legal authority, and are illegal precincts, and, consequently, that the election sought to be enjoined in such precincts will, if permitted to be held, be an irregular election. Conceding this, the question is presented whether such irregular election, if held, will be so far vitiated by its illegality that, in the event of a contest, the lawful voters will lose their votes, and the election itself be set aside by a court of competent jurisdiction.   It is our opinion that no such inference can be drawn from the facts set forth in the petition.   .   .   .   Finally, we hold, for the purposes of the motion under consideration, that the proposed election in the precincts in dispute, if actually held, will not be an invalid and wholly void election, but will be merely an irregular election, and one which, in our opinion, cannot so operate as to have any injurious effect upon any substantial rights of voters or of candidates.   It is elementary that mere irregularities in conducting an election, which is fairly conducted, and which do not defeat or tend to defeat an expression of the popular will at the polls, will not so operate as to vitiate an election.   To this rule there is an important exception.   Where the statute in terms declares or necessarily implies that any particular act or omission shall defeat an election, the same is construed as a mandatory statute, and every such statute is required to be enforceable strictly in accordance with its terms."   Citing Perry v. Hackney, 11 N. D. 148, 90 N. W. 483; Davis v. State, 75 Tex. 420, 12 S. W. 957; Peard v. State, 34 Neb. 372, 51 N. W. 828; Bell v. Faulkner, 84 Tex. 187, 19 S. W. 480.   And in the opinion in Perry v. Hackney, we find copious extracts from Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101.   The Missouri and Texas cases, therefore, have already been approved by our own court in a case with facts very similar to this.   And

Texas has followed the early cases in Ex parte White, 33 Tex. Crim. Rep. 594, 28 S. W. 542, wherein a constitutional provision similar to the one here involved is also discussed. And in 1898 New York has announced a similar rule under identical statutory and constitutional provisions. See People ex rel. Lardner v. Carson, 10 Misc. 237, 30 N. Y. Supp. 817, affirmed on appeal in 86 Hun, 617, 35 N. Y. Supp. 1114, and reaffirmed on appeal in the New York court of appeals in 155 N. Y. 491, 50 N. E. 292, where both sides of the question are discussed and a strong dissenting opinion filed. The discussion in the New York case is mainly on the constitutional question involved, the dissent being placed wholly upon that ground. The facts in that case are best stated in the dissenting opinion, from which we quote: "At the time of said election the town of Lockport had been divided into two election districts, and the polling place for the first district, designated according to the city charter, was in a building situated within the city, known as No. 11 Main street, which was in the second election district of the first ward of the city of Lockport. The polling place for the second district designated in the same way was also inside the city limits, in a building known as No. 49 Locust street, which was in the first election district of the third ward in said city. Each of said polling places was about 1 mile from the nearest boundary of the said election districts of the town. The polling places for the city were distinct from those for the town, and no elector residing in the city voted at either of the town polling places, and no voter residing in the town voted at any of the city polling places." Thus, the voters of the first district were obliged to go into the second district to cast their ballots, and the voters of the second election district were likewise required to go into the first election district to vote. It is thus parallel to the voters in the first, second, and third wards of Devils Lake being required to cast their ballots without the limits of their wards and at the fire hall within the fourth ward, if we grant that ward lines are to be taken as defining the election districts, and then attempt to reason that § 121 of the Constitution, in defining a voter's qualifications, in the use of the term "shall be a qualified elector at such election," refers particularly to the election held in the precinct wherein he resides. We quote from the opinion in People ex rel. Lardner v. Carson: "We are told that the Constitution enacts that the elector must vote 'in the elec-

tion district of which he shall at the time be a resident, and not elsewhere.' So it does; but what is an election district, and by what power is it made, changed, or abolished? The Constitution has left all that to the legislature, and hence an election district is just what the legislature chooses to make it. In this respect it is supreme. It may say that the district shall be small or large, with such territory as it thinks proper, and it may even locate the polling places according to its own judgment and discretion. These details are sometimes delegated to local authorities, but it can confer no power upon them that it does not possess itself. If the district is so situated that there is no convenient place within it to hold an election, there is nothing in the Constitution that prohibits the legislature from authorizing the local authorities to locate the polling place on the other side of the imaginary line which bounds the district where there may be such a place. In a word, the whole subject of creating election districts and locating the polling places where the residents of the district may vote is with the legislature, and it may lawfully delegate this power to local authorities." And it will be noticed that our Constitution does not limit the local authorities in the establishing of the voting place to the establishment of a voting place in the precinct in which the elector resides. It does not touch upon that matter which is left wholly to legislative direction, which in turn, by § 742, has delegated to the council the power of designating the voting place "in each ward." "Except in cities where aldermen are elected at large, the council shall designate one polling place only." In which case the whole city shall constitute but one election district or precinct. In the language of the opinion in People ex rel. Lardner v. Carson: "There is nothing in the Constitution that requires the voter, when offering his vote, to stand on the soil embraced within the boundary lines of the district, or that prohibits the legislature from making a room or building in an adjoining district a part of the district where the voter resides, for the purpose of registering and casting his vote. All that the Constitution requires is that the elector must vote at the polling place designated by law for casting the vote of the district where he resides, and the validity of his vote is not affected by the circumstance that the place is located on the wrong side of an imaginary line. When he does that, he votes in the district of his residence, and not elsewhere, within the spirit and even within the

letter of the Constitution. . . . An arrangement made by law for enabling the citizen to vote should not be invalidated by the courts unless the arguments against it are so clear and conclusive as to be unanswerable." And, again, under the contention made that the law thus fixing the polling places was unconstitutional and void, that court says: "Finally, if it be granted that the contention of the relator be correct in its full length and breadth, it does not at all follow that votes cast at a lawful election by qualified electors at a place designated by an unconstitutional law are void. [Citing] People v. Cook, 8 N. Y. 67, 59 Am. Dec. 451; People ex rel. Watkins v. Perley, 80 N. Y. 624; People ex rel. Woods v. Crissey, 91 N. Y. 616; People ex rel. Angerstein v. Kenney, 96 N. Y. 294; Demarest v. New York, 147 N. Y. 203, 41 N. E. 405. . . . But if the courts should hold the law invalid as conflicting with the Constitution, would it follow that all votes cast or elections held under it were void? To so hold would invite not the reign of law, but of anarchy; since the decision carried to its logical consequences would overthrow every power of government, without the ability to substitute anything in its place. The truth is that neither the Constitution, nor any law, attaches such absurd consequences to the error in the location of a polling place. The object of the Constitution is to secure to every citizen the right to cast one honest vote. To that end it enacts that he shall vote at his own home with his neighbors, where he is known, and not at some other polling place, where he may not be known. But all this is fully complied with when he votes with his neighbors at the place designated by law for that purpose; and whether that place be located on one side or the other of an imaginary line bounding a town or district is not, in the constitutional sense, a matter of the slightest consequence."

And Peard v. State, 34 Neb. 372, 51 N. W. 828, is in line with our conclusions, that the electors of the city may legally vote outside their wards, assuming that by so doing they are voting outside their precincts. We quote: "The voting at the polling place outside the commissioner district is, at most, an irregularity not affecting the merits of the case. To reject the votes now would be not only to disfranchise the voters, but to defeat the will of the majority fairly and honestly expressed. The court will hesitate before adopting a construction that will be attended by such consequences. The rule may be said to be

well settled that courts will not disfranchise voters, when the election was fair and the result free from doubt, unless required to do so by the peremptory requirements of the law." 6 Am. & Eng. Enc. Law, 325, and note. The only decision we have been able to find supporting the appellant is Bean v. Barton County Ct. 33 Mo. App. 635, decided in 1889, but which is not mentioned in Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101, from the supreme court of Missouri three years later, in effect at least overruling Bean v. Barton County Ct. But the decision in Bean v. Barton County Ct. is expressly placed upon insufficient notice of the election declared void. And McCrary on Elections, at § 228, while laying down the rule that the time and place of the election are generally of the substance of the election, qualifies it by the statement that "the principle is that irregularities which do not tend to affect results are not to defeat the will of the majority; the will of the majority is to be respected even when irregularly expressed." Nor do we regard Territory ex rel. Higgins v. Steele, 4 Dak. 78, 23 N. W. 91, as authority for plaintiff. There it was sought to sustain the action of the commissioners of Kidder county in an attempt to compel the people of the entire county to vote at one precinct, at the county seat, on the question of the issuance of bonds to build a courthouse, when the county had been divided into established election precincts with some of the usual voting places nearly 20 miles from the county seat. The fraudulent intent to prevent a full county vote was clearly apparent as the reason for fixing one voting place for an entire county on a county bonding question. The case before us is one concerning a special election for a city, and pertains to the municipality alone. No inconvenience of voters attending tended to restrain voting. There is a difference between requiring the people of such a limited area to vote at one voting place, from requiring the people of Ramsey county, for instance, to vote at one voting place. This distinction is too apparent for need of comment. Fraud there appeared as the reason for calling the election to be so held. Besides, prior to the enactment of chapter 65 of the Session Laws of 1911, no statute would have been disregarded had the election on this matter been conducted as it was, it being a special election; otherwise there was no necessity for the amendment to include such elections.

For another recent holding sustaining this opinion, and without

which a review of the authorities would not be complete, see State ex rel. Lane v. Otis, 68 N. J. L. 656, 54 Atl. 442, where an election was sought to be invalidated "because the polling place selected by the clerk, and advertised as the place for said voters to vote, was not in fact located within the territory . . . within the township voting district, but was in fact in a building situated within the territorial boundaries" in another borough. "There is no allegation of fraud on the part of anyone. Does the mere fact that a voting precinct or polling place has been selected outside the district defeat the whole vote cast at such polling place? That does not raise the question of one voter lawfully entitled to vote in one district voting in the ballot box of another district, but is the case of a voter voting at the polling place provided for him to vote at for the district in which he resides. . . . The voter must vote or be disfranchised at the place selected by the clerk and advertised as the polling place for the 'election district' in which he resides. These sections of the election law only fix the method of selecting the place and giving notice to the voter where he may lawfully vote as a resident of a particular election district. An error of the clerk in the selection of the place should not disfranchise the voter, no matter where the place is, if it is the place selected and advertised, and where the proper election officers conduct the election, and is the only place lawfully provided for the voters of that particular election district to vote at. The ballots thus cast are cast by legal voters, and cast at the place provided for that purpose by the officer charged with that duty by law. If a clerk by selecting a place just over an election district line could defeat the whole vote of the district, it would be putting a premium on fraud. The right of suffrage is too sacred to be defeated by an act for which the voter is in no way responsible, unless by the direct mandate of a valid statute, no other construction can be given. There is nothing in our election law which requires a rejection of votes honestly cast and counted in a case like the one before us." This was said in construing their election statutes, one of which there quoted, reads: "Every person possessing the qualifications required by the Constitution, and being duly registered as required by this act, shall be entitled to vote in the election district in which he actually resides, and not elsewhere," quoting from page 659 of the reported opinion. The decision is dated in 1903. Article 2 of the New Jersey Constitution, de-

claring the right of suffrage, merely defines the qualifications of electors, as does our own. But the statute quoted is fully as stringent as any we have. The New Jersey case cites and follows People ex rel. Lardner v. Carson, 155 N. Y. 491, 50 N. E. 292; Ex parte White, 33 Tex. Crim. Rep. 594, 28 S. W. 542, and Peard v. State, 34 Neb. 372, 51 N. W. 828.

We are aware Pennsylvania and Wisconsin holdings would, if followed, inject into this case a constitutional barrier to the validity of this election. We refer to the cases of Chase v. Miller, 41 Pa. 403 ; Re McNeill, 111 Pa. 235, 2 Atl. 341, and State ex rel. Wannemaker v. Alder, 87 Wis. 554, 58 N. W. 1045. Investigation will show that these decisions are under Constitutions which not only prescribe the qualifications of electors, but, as is said in Chase v. Miller, 41 Pa. on page 419, prescribe "a rule of voting also ;" and the same reference is also made in the McNeill Case, 111 Pa. on page 237, 2 Atl. 341, wherein the court says the new Constitution of 1838 "introduces not only a new test of the right of suffrage, but a rule of voting also." In brief, § 6 of the Pennsylvania Constitution of 1776 merely prescribed an elector's qualifications. The same with the second Constitution of Pennsylvania of 1790. See § 1, art. 3, thereof. When the third Pennsylvania Constitution became effective in 1838 it contained a radically different provision, and, in addition to prescribing the qualifications of an elector, announced a rule for voting, as is declared by said decisions construing it. See § 1, art. 3, thereof, reading: "In elections by the citizens every white freeman of the age of twenty-one years, having resided in this state one year, and in the election district where he offers to vote ten days immediately preceding such election, . . . shall enjoy the rights of an elector." And the fourth Pennsylvania Constitution of 1873 still perpetuates this distinction by the words: "He shall have resided in the election district where he shall offer to vote at least two months immediately preceding the election." Sec. 1, art. 3, of the Wisconsin Constitution, is very similar to that of Pennsylvania. It reads: "Every male person of the age of twenty-one years or upwards . . . who shall have resided in the state for one year next preceding any election, and in the election district where he offers to vote . . . not exceeding thirty days, shall be deemed a qualified elector at such election." Obviously the words, "where he offers to vote," must have some

significance. They are not in our constitutional provision, which defines merely an elector's qualifications, leaving the time, place, manner of voting, boundaries of election precincts, and kindred matters to legislative enactment without constitutional restrictions, so long as suffrage is not abridged. These cases may be distinguished on other grounds also, but the constitutional distinction is clear. And the New York, Texas, Missouri, and New Jersey cases decided under constitutional definitions of an elector similar to our own must be followed. We might call attention that cases opposed to the Pennsylvania cases cited may be found from that state, as are noted and cited in 10 Am. & Eng. Enc. Law, 2d ed. 688; at which place also is cited Bean v. Barton County Ct. 33 Mo. App. 635, the lone case appearing to support appellant's contention, but no reference is there made to Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101, in effect a contrary holding to the earlier case of Bean v. Barton County Ct. Minnesota is in line with our holding. See Stemper v. Higgins, 38 Minn. 222, 37 N. W. 95.

It is urged that § 8597 of the Penal Code applies, reading: "Every person who, at any election, knowingly votes or offers to vote in any election precinct or district in which he does not reside, or in which he is not authorized by law to vote, is guilty of a misdemeanor." But in this section is drawn a distinction between the district in which he resides and in which he is authorized by law to vote. And in any event the penal provision could not here apply, as no one would say that the voters generally, by voting, each committed a crime, because the voters in certain wards followed the direction of the lawful authorities calling the election, and making the city one *de facto* voting precinct for this city election, by requiring that all voters vote at one central polling place. In law, four polling places should have been opened and four precincts should have existed for this election, but in fact but one voting place was opened, and but one precinct or election district did actually exist, composed irregularly of a combination of all election districts or wards of the city. The penal provision does not apply to the voter who votes at the same place fixed by lawful authority to vote, as do all the electors in the precinct in which he resides. Every elector in Devils Lake who voted at this central voting place voted in the precinct of his residence, within the meaning of the provision of the Con-

stitution defining an elector. People ex rel. Lardner v. Carson, 155 N. Y. 491, 50 N. E. 292; State ex rel. Lane v. Otis, 68 N. J. L. 656, 54 Atl. 442. And the election must stand or fall according as it be, as a whole, determined to be irregular or void *ab initio*. We believe that, in the absence of any statutory provisions expressly declaring an election so held to be invalid, we must hold the election legal and valid under this attack, following the reasoning of State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; Davis v. State, 75 Tex. 420, 12 S. W. 957, followed in Ex parte White, 33 Tex. Crim. Rep. 594, 28 S. W. 542; Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101, the doctrine of which is expressly approved in Perry v. Hackney, 11 N. D. 148, 90 N. W. 483, and again followed in State ex rel. Byrne v. Wilcox, supra; and People ex rel. Lardner v. Carson, 155 N. Y. 491, 50 N. E. 292; and State ex rel. Lane v. Otis, 68 N. J. L. 656, 54 Atl. 442.

The foregoing authorities are distinguishable from holdings similar to Elvick v. Groves, 17 N. D. 561, 118 N. W. 228, and State ex rel. McCarthy v. Fitzgerald, 37 Minn. 26, 32 N. W. 788, cited by appellant. The latter case is a holding declaring a statute unconstitutional making no provision for the exercise of the right of suffrage and in effect disfranchised those having such right. No one is claimed to have been disfranchised in this city election, and the case is not in point. In Elvick v. Groves, supra, to which we might add the recent Burke county-seat case of State ex rel. Johnson v. Ely, 23 N. D. 619, 137 N. W. 834, a different principle was involved than before us in this case. In those cases the precinct officers and electors arbitrarily, and for mere convenience and without necessity, held the election in the precincts concerned at a different voting place than that fixed by the county commissioners as the official voting place. In Elvick v. Groves, reading from page 565 of the report, "the established voting place was arbitrarily changed to a place between 3 and 4 miles distant. No excuse is shown except that it was deemed by the electors at the meeting that resolved in favor of the change that schoolhouse No. 3 was a more convenient location for the electors generally. We do not think the question as to which is the most convenient place for a voting place should be left to the judgment of the voters independently of or contrary to the judgment of the county commissioners. On that question

we think the action of the county commissioners should be deemed final, and not subject to change by the authorities except under extraordinary circumstances. Circumstances may arise making a change absolutely necessary, but the question of convenience should not be considered an excuse or justification for the setting aside of the official action of the proper authorities on so important a question as the establishment of a place for voting in a precinct." The court cites Knowles v. Yeates, 31 Cal. 83, where the precinct election was held 6 miles from the voting place officially designated. Thus, it will be seen this court there was asked to decide and establish precedent thereby as to whether, for a mere supposed convenience of the voters, with no question of necessity involved, official discretion and action of the lawful authority establishing the official place for voting could, by mere caprice and for mere convenience, be overridden by the election officers and electors voting. If, in the Elvick v. Groves Case the vote had been upheld, it would have meant that the official action of the county commissioners in designating the voting places meant but little; and our court, following the weight of authority, sustained official action. But these cases, by their terms, do not apply to an election held at a place changed under force of necessity, as where the building to be designated as the official voting place and to be occupied for such purposes had, prior to election, burned or been removed. In the case before us the election was noticed, by the proper officer to give notice thereof, that it would be held at the one central voting place for the entire city. While the record is silent as to the authority under which it was noticed, we must assume, inasmuch as the authority of the clerk to notice the same is unchallenged, that the election so noticed was in obedience to the direction of the city council, and that the election was so held and conducted pursuant to order of the lawful municipal authority to call and conduct the same. The voters, then, as is said in the New Jersey case cited, must have voted there, or not at all. They have but complied with the election requirements in so voting, and have not disregarded any official action; and the validity of the election is not measured by any irregularity, misconduct, or omission on the part of any of the election officers, but must stand or fall upon the disregard, by the proper municipal authorities calling the election, of ward lines, and their failure to open places for voting in each ward. The determination of this ques-

tion must be decided by different principles than apply to the mere conduct of a precinct election.

But appellants urge that the election must fall because more than 100 voters named in the complaint were allowed to vote at said election without being "registered as required by chapter 128 of the Laws of 1911," and "without furnishing to the judges of said purported election their respective affidavits containing a statement to the effect that they, or either of them, were residents and voters of the precinct in which they were allowed to vote, and without showing by such affidavit that they were qualified voters of said city, and without proving, by the oath of a householder or registered voter, that they or either of them were qualified voters in said purported election; and plaintiff alleges that a great many of those not registered as required by law, and who were allowed to vote at said purported election, were not then and there qualified voters of the city of Devils Lake." Then follows the names of 193 of such purported voters. Upon this portion of the complaint, appellant assigns error in that the persons named, in voting at the central polling place, voted without the limits of their precincts, and hence were not registered voters of the precinct in which they cast their votes; and in support thereof cites the penal statute, § 8797, Rev. Codes 1905; and also § 7242, Rev. Codes 1905, that the annual elections in such cities shall be held "at such place or places in each ward as the council shall designate." Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95, a holding upon a general election, is cited as invalidating this special election, because of want of registration prior to the election. Much said heretofore upon the validity of the election here applies.

This assignment must fall when we fail to find any provision of law requiring a registration prior to a special election held for this purpose. Such an omission is probably the result of legislative oversight, but is something that the courts cannot cure without in fact legislating. Prior to chapter 65 of the Session Laws of 1911, § 2743, regulating city election districts, was silent as to the boundaries of said districts, except for state and county elections, leaving special and school elections in cities to other regulations as to wards and voting precincts. Then chapter 65 of the Session Laws of 1911 brought city and school elections under the provisions of law as to wards and elec-

tion precincts governing county and state elections. But prior to such amendment, § 2744, Rev. Codes 1905, provided "that the city council shall provide for the registration of all voters as required by the laws of the state;" which had particular reference to §§ 732 to 746 inclusive, being art. 16, entitled "Registration of Voters," of chap. 8, of the Political Code and governing elections. A reference to §§ 732 et seq. discloses registration to be required for "any general election or annual city election" only; and the original section, 738, amended by chapter 128 of the Session Laws of 1911, concerned only such elections, the general election or the annual city election, to vote at which registration was required. Hence chapter 128 thereof, containing the words, "no vote shall be received at any election in this state if the name of the person offering such vote is not on the register," and following provisions, has no application to a special city election, and cannot broaden the provisions of the article, especially when we find that nowhere in the law is there any specific requirement for registration to vote at a special city election, nor is there any time provided at which such registration shall be had prior to a special city election for bonding purposes, nor is the time specified at which registration must be had except prior to general and annual city elections, under the provisions of §§ 732 and 735, Rev. Codes 1905. None of the statutes as to registration apply to special city elections for purposes such as bonding. So that the provision of § 2744, providing that the city council "shall provide for the registration of all voters as required by the laws of this state," is not applicable to this special election, inasmuch as there is no law of this state authorizing registration in advance of such an election. And this is borne out by the plain provisions of § 2749, Rev. Codes 1905, providing that the city council, "in all cases when necessary for the purposes of this chapter, may call special elections, canvass the returns thereof, and provide by ordinance for the mode of conducting the same; and shall give notice of such special elections, in which shall be stated the questions to be voted upon, and cause such notices to be published for the same length of time and in the same manner as is required in the case of regular annual elections in such city, unless herein otherwise provided." And we find this election is authorized specifically under the provisions of art. 4, empowering the submission of this question "at a

general or special election" to the voters of the municipality. So, the election was called, in one of the cases, "necessary for the purposes of this chapter," and was a valid special election so far as authority to call the same was concerned. And the only conclusion we can arrive at is that either by legislative oversight no provision for registration at this special election is provided by statute, or else it was purposely left to the city council to provide by ordinance for such registration, under the provisions of § 2749, authorizing it by the words, and "provide by ordinance for the mode of conducting the same," referring specifically to special elections so-called when necessary for the purposes of the chapter in question. The pleadings and affidavits do not disclose whether any ordinance existed requiring registration in advance of this election. Hence, the assignment based upon an erroneous supposition that registration was a requisite to a valid election must fall.

Then, again, appellant in his complaint alleges "that at said purported special election the following who were not qualified voters or electors in the city of Devils Lake were allowed to vote." Then follows the names of twenty-one persons. Upon this allegation appellant, in assigning error, reasons that six of these illegal voters may have voted for the increase in the debt limit, without which illegal votes the necessary two-thirds vote to authorize such increase, under § 2678, Rev. Codes 1905, would not have been had. Needless to say this assignment is based upon no allegation to that effect in the complaint, granting that the election could be so assailed. Should proof be made on trial that twenty-one persons, not legal voters, participated in such election, that would in nowise invalidate the election, or raise any inference in the absence of further proof of fraud in the conduct of the election, or that the fraudulent votes would in fact change the result thereof. Neither fraud nor that the result was changed is here alleged. And if we would, under such circumstances, purge the returns of such illegal votes, by deducting from both the affirmative and the negative that proportion of the twenty-one votes assumed to be illegally cast, proportionate to the total vote that each affirmative and negative total bears to the total number voting, the rule prescribed by McCrary on Elections, § 495, applicable under some circumstances, a two-thirds majority would still remain in favor of the increase in

the debt limit; so that result would not be affected, even though we treat this allegation of the complaint as sufficient to authorize the casting out of twenty-one illegal votes.

Appellant also urges that there was a defective publication of notice of election, because the newspaper in which it was published had never been designated as the city official newspaper. We do not think it necessary to the validity of the notice that it be published in the official newspaper of the city. Sec. 2678, Subdiv. 5, provides that the election shall not be held until "after twenty days' notice in a newspaper published in the city." It was so published. The statute was complied with. But the newspaper in which such publication was made was the official city paper, so designated under § 2677, at a meeting held sometime in October, instead of in May. The time direction in this statute is directory, like most time requirements. The statute, from its terms, would bear no other construction, it providing for designation by the council "at its first meeting in May, or as soon thereafter as practicable" of the city newspaper.

We now approach questions more difficult of solution. Appellant maintains that, though the election as such was valid, nothing was authorized thereby. That fatal defects exist, in that the resolution of the city council authorizing the submission of the issuance of these bonds to the people for authorization by them, under § 2678, Rev. Codes 1905, is a nullity, because (a) it was not passed as an ordinance, but instead is simply the resolution of the city council; (b) that the resolution is fatally indefinite in the amount of the proposed bonded indebtedness to be submitted to ballot; (c) that the ballot itself is void as indefinite in the amount of bonds authorized; (d) that the notice given of the special election did not inform the voters that an election would be held to submit to them the question of bonding for a certain determined amount, as required by statute; and also that the resolution calling the election was insufficient because of the foregoing particulars to authorize the legal notice to be given of the special election; (e) that because of the form of the ballot, grouping together and thereby exacting a vote upon propositions jointly that should have been voted upon separately, no expression of popular will was had upon either of the two questions submitted, and the election falls.

The city council by resolution found the necessity for the establish-

ment of a municipal electric lighting plant for the city, and that one could be established, "abundantly sufficient to supply the city of Devils Lake for lighting and power purposes" . . . at a cost of "not to exceed $33,000," and that the assessed valuation of the city for that year was $1,154,000; that it was necessary for the welfare of the city and its inhabitants that such municipal light plant should be established. And further that:

"Be it further resolved that the following question be submitted to the legal voters of the said city: 'Shall the city of Devils Lake be authorized to increase its indebtedness 3 per cent on its assessed valuation, beyond the 5 per cent limit now prescribed by law, for the purpose of establishing a municipal light plant for said city, and said city be authorized to issue bonds for said indebtedness in the sum of $33,000, drawing interest at the rate of 5 per cent per annum, payable annually, said bonds to be issued for a period of twenty years, the denomination of said bonds to be one thousand dollars ($1,000) each.' "

It will be noticed that this resolution contemplated the submission of a question of increasing the indebtedness and also the issuance of $33,000 worth of bonds described, as a separate matter, both for the specified purpose of establishing a municipal light plant. Then followed a resolution fixing the form of the ballot. Pursuant to this resolution, notice of such special election was given, that it was to be held November 5, 1911, for these specified purposes, and at the one central voting place. Then followed in the notice of election the recital of the same form of ballot as fixed by the resolution of the city council. The notice of election was definite as to time and place of holding, and as to the question of increase of indebtedness, and also definite as to the sum ($33,000) for which bonds were to be issued.

The official ballot used at the election reads as follows:

Shall the city of Devils Lake be authorized to increase its indebtedness and to issue its bonds therefor in an amount equal to 3 per cent of its assessed valuation over and above the 5 per cent limit of indebtedness on the assessed valuation as now provided by law, in accordance with the provisions of subdivision 5, of § 2678, of the Rev. Codes of North Dakota for the year 1905, for the purpose of establishing a municipal light plant and of issuing bonds therefor in a sum not to

exceed said increased indebtedness; said bonds not to exceed $33,000; which bonds shall be in a denomination of $1,000 each, drawing interest at the rate of 5 per cent per annum, payable annually, and said bonds to be issued for a period of twenty years?

In favor of said increased indebtedness and issuance of bonds... ☐

Against said increased indebtedness and issuance of bonds ..... ☐

More than two thirds of those voting at the election voted "in favor of said increased indebtedness and issuance of bonds." This ballot thus submitted two questions: (1) Whether the debt limit should be increased as authorized by the Constitution and statute; and (2) whether bonds therefor, in an uncertain amount "not to exceed $33,000," should be issued, all for the purpose expressed "of establishing a municipal light plant and paying therefor." It was sought to combine two elections. The Constitution and the statutes undoubtedly contemplate two separate elections, although both may properly be consolidated and held as one when a separate vote on each question is permitted. The Constitution, § 183, authorizes a city by a two-thirds vote to increase its indebtedness 3 per cent beyond an existing 5 per cent limit of indebtedness. The statute, subdiv. 5 of § 2678, provides the restrictions under which this may be done; and subdiv. 11 empowers the city council to build such a municipal lighting plant. To increase such debt limit an affirmative two-thirds vote is required. After the limit of indebtedness has been thus increased to a total of 8 per cent of the city's assessed valuation, the city is authorized to incur an indebtedness to that limit for such purposes.

Both counsel have submitted this case upon the theory that the election must fall as to both propositions, if either increase of debt limit or authorization of bond issue be invalid. Examining the election as to each, we find the bond election defective in the form of ballot used. In the resolutions and notice of election, the question of increase of indebtedness is definitely and separately stated. As to the ballot used both propositions are attempted to be set forth, the only uncertainty arising from the use of the words, "not to exceed $33,000," as the amount in which bonds are to be authorized. There is no uncertainty in the submission of the question as to the 3 per cent increase of the debt limit. The election, unless invalid for other reasons, must have

authorized at least an extension of the debt limit.  As to the issuance of bonds, the resolution authorized the issuance in a definite amount "in the sum of $33,000."  And the notice of election was equally definite.  The uncertainty in the matter of amount was caused by the official ballot using the words, "said bonds not to exceed $33,000." Under the statute cited, as construed in Stern v. Fargo, 18 N. D. 289, 26 L.R.A.(N.S.) 665, 122 N. W. 403, we must hold that such portion of the ballot as to bonding did not authorize the issuance of a bonded indebtedness for a definite amount, but instead sought to delegate a nondelegable matter to the city council, i. e., the determination of the amount of the bonds to be issued, the words, "not to exceed $33,000," not definitely stating the amount "for which said bonds are to be issued" to comply with the requirement of subdiv. 5, of § 2678, Rev. Codes 1905.  The reasons are stated in Stern v. Fargo.  We are aware that there are two lines of authorities on this question, but our court is committed by that holding.  Respondent, to avoid this precedent, contends that what was there said was with reference to the notice of election, and that as the resolution and notice of election in this case are specific in the amount of bonds authorized, any uncertainty in the ballot in this respect is but an irregularity.  But the ballot is the instrument by which the voters empower the city council as their agent to incur the indebtedness.  The voter does not merely assent to the exercise of a power existent in the council, but, instead, delegates a power to it.  In order to clothe the council with this power, it is necessary that the ballot, provided by law with which to confer it, shall be as definite as to the amount for which the indebtedness is authorized as it is that the manner of creation of the debt by issuance of bonds should be definite.  The city has no implied powers in these respects. Stern v. Fargo, supra; 1 Dill. Mun. Corp. 5th ed. §§ 237 et seq.  If it is necessary, as held in Stern v. Fargo, that the notice of election shall definitely state the amount of the proposed indebtedness to be passed upon by the election, it certainly is necessary that the ballot be equally definite in such particular.  The statute must be construed as applying to the substance of the ballot, and that, by failing to definitely specify the amount of bonds to be authorized, the election as to bonds is invalid under this direct attack thereon.

But does the submission of both propositions, the increase of the debt

limit and the issuance of bonds upon one ballot in the form submitted, invalidate the entire election or only the bond issue? The election to increase the debt limit, as heretofore stated, was called in compliance with a constitutional provision, § 184 thereof. Concerning this, Dillon on Municipal Corporations, 5th ed. § 213, says: "Although the Constitution may not contain any direction as to the manner in which the question shall be submitted, other than that the assent of the voters shall be obtained at an election 'for that purpose,' it is implied in the constitutional direction that the voters shall be permitted to express their opinion on the question of creating the indebtedness *per se,* disconnected from any other district and different proposition, which may be submitted for their consideration, not related to the subject of incurring the debt. But the project or improvement . . . with which it is proposed to incur the debt, and the debt itself, have a necessary relation to each other, and they may be submitted together although the opinion has been expressed that even in such cases the better practice would be to provide for separate elections on these questions." It will be noted that this rule does not prohibit the voters from expressing their opinion at the same time upon this question of bonding, provided they may so express their opinion separately upon the questions submitted. Accordingly it was proper that the ballot should also state that the purpose for the authorization of the 3 per cent increase of indebtedness was to establish a municipal light plant.

Concerning the dual propositions voted upon at the election, the ballot specified clearly both questions,—(1) the increase of the debt limit, and (2) the issuance of bonds should the debt limit be increased. Does the failure of the bond question, because of the ballot being indefinite in amount of bonds to be so authorized, invalidate also the election as an expression of a desire to increase the debt limit? We cannot see how the bond question has prejudiced the election upon the increase of the debt limit. Every voter was charged by law with knowledge that the primary purpose of the election was to increase the debt limit, and must have known, as a matter of law, that without that increase no bond issue could be authorized. Hence the bond issue being dependent for validity wholly upon the constitutional increase of the debt limit, in nowise could affect the decision of or influence the voters in voting upon the question of whether the constitutional

increase should be had or not. To illustrate, if the voter was in favor of the issuance of bonds, he must also be in favor of increasing the debt. limit, otherwise we must presume him to be ignorant of the law. So, too, if the voter be favorable to both issuance of bonds and increase of the debt limit, he has but expressed his opinion when he votes affirmatively on both propositions at once. Then, again, if he is in favor of an increase of the debt limit, but against the increase of bonds, but. for any reason because of the debt limit feature is induced to vote for the bonds as well as the debt limit increase, nevertheless he has in fact expressed but his opinion upon the increase; and the only prejudice he, as a voter, has suffered, has been to vote for the bond issue which he did not desire. The voter, then, in voting for an increase of the debt limit, has been neither influenced for nor prejudiced by the bond question, unless you impute to him ignorance of law, which is contrary to the controlling presumption that every man is supposed to know the law. Of course, if the voter was against increasing the debt limit, as 156 of them were at this election, he had the opportunity to vote against the debt limit and has availed himself of it. And no voter can be presumed to be so ignorant of the law as to be against the debt limit and still be for the issuance of bonds, to consummate which would contemplate a legal impossibility. This covers every phase of the ballot situation from the voter's standpoint. Our conclusion is that it is self-evident that no voter could be misled by the form of the ballot requiring a vote for or against both propositions and without separating them. The questions should have been so submitted that each could have been voted upon separately. But the election is as to increase of the debt limit a valid expression of the popular will, and a valid increase of the debt limit for the purpose. As authority for sustaining an election under such circumstances, see State ex rel. Canton v. Allen, 178 Mo. 555, 77 S. W. 868–875; and Thompson-Houston Electric Co. v. Newton (C. C.) 42 Fed. 723.

Finally it is urged that the election was unauthorized because it was. brought about by a resolution of the council, instead of under a city ordinance. Appellants urged that the charter clothed the city council with general power to provide for lighting the city, but as to the mode of carrying it into effect it was powerless to exercise that right except through the medium of ordinances duly passed under the pro-

visions of subdiv. 77, of § 2678, and § 2679, Rev. Codes 1905, and cite in support of their contention Engstad v. Dinnie, 8 N. D. 1, 76 N. W. 292; and Roberts v. Fargo, 10 N. D. 230, 86 N. W. 726. We cannot agree with this construction of the law. It will be noted that, concerning the exercise of the powers conferred upon the city council to submit to the municipality these questions, at no place is it expressly required that it shall be done by ordinance. Section 2679 provides: "When by this chapter the power is conferred upon the city council to do and perform any act or thing, and the manner of exercising the same is not specifically pointed out, the city council may provide by ordinance the details necessary for the full exercise of such power." This confers upon the city council the power of controlling the details of the execution of its power by ordinance; but among the powers of the council is subdiv. 5 of § 2678, authorizing the increase in the limit of indebtedness and an election for voting bonds. This provision itself provides all the essential details, and leaves little, if anything, to the necessity of regulation by ordinance, and hence no necessity exists for an ordinance on the subject. Concerning such an election 28 Cyc. 549, announces the rule to be, "A resolution or order authorizing an election is sufficient where a formal ordinance is not expressly required." Citing Hamilton v. Detroit, 83 Minn. 119, 85 N. W. 933; and State ex rel. Canton v. Allen, 178 Mo. 555, 77 S. W. 868.

Concerning this question, vol. 2, of 5th edition of Dillon on Municipal Corporations, at §§ 571, 572, also effectually answers the point urged. We quote: "It has been said that a resolution is an order of the council of a special and temporary character, while an ordinance prescribes a permanent rule of conduct or government. This statement of the characteristics of resolutions and ordinances points out generally the proper province of these forms of municipal action." Our statute is silent as to whether a resolution or ordinance shall be passed as a basis for increasing the debt limit and for bonding. To hold a resolution necessary, we would, by construction, apply a general statute governing ordinances to this particular subject-matter. To do so would violate the general rule as announced by Cyc., and also by § 572 of Dillon, which reads: "The general rule has been laid down by many decisions, that when the charter commits the decision of a

matter to the council, and is silent as to the mode,—neither expressly nor by necessary or clear implication requiring the action of the council to be in the form of an ordinance,—the decision of the council may be evidenced by resolution, and need not necessarily be by ordinance. This rule has been laid down without any qualification restricting it to those acts and decisions which are of a special and temporary nature, and which do not involve any permanent rule of conduct or government,"—citing cases from many states on bonding matters, waterworks, and light contracts, including National Tube-Works Co. v. Chamberlain, 5 Dak. 54, 37 N. W. 761; Crawfordsville v. Braden, 130 Ind. 149, 14 L.R.A. 268, 30 Am. St. Rep. 214, 28 N. E. 849; Board of Education v. DeKay, 148 U. S. 591, 13 Sup. Ct. Rep. 706, 37 L. ed. 573, 13 Sup. Ct. Rep. 706; Alma v. Guaranty Sav. Bank, 8 C. C. A. 564, 19 U. S. App. 622, 60 Fed. 203; Illinois Trust & Sav. Bank v. Arkansas City, 34 L.R.A. 518, 22 C. C. A. 171, 40 U. S. App. 257, 76 Fed. 271; Roberts v. Paducah, 95 Fed. 62; Ogden City v. Weaver, 47 C. C. A. 485, 108 Fed. 564; Los Angeles Gas Co. v. Toberman, 61 Cal. 199; Pollok v. San Diego, 118 Cal. 593, 50 Pac. 769; Smalley v. Yates, 36 Kan. 519, 13 Pac. 845, same case in 41 Kan. 550, 21 Pac. 622; Lincoln Street R. Co. v. Lincoln, 61 Neb. 109–144, 84 N. W. 802; State, Van Vorst, Prosecutor, v. Jersey City, 27 N. J. L. 493; Burlington v. Dennison, 42 N. J. L. 165; Brady v. Bayonne, 57 N. J. L. 379, 30 Atl. 968; Porch v. St. Bridget's Congregation, 81 Wis. 599, 51 N. W. 1007; Green Bay v. Brauns, 50 Wis. 204, 6 N. W. 503, and other cases. See also Seymour v. Tacoma, 6 Wash. 138, 32 Pac. 1077.

As to the cases cited by appellant, we do not consider them in point. Both were construing § 2262 of the Rev. Codes of 1895 (§ 2753, Rev. Codes 1905), requiring the council to pass an ordinance to determine the annual appropriation bill in which it "may appropriate such sums of money as may be deemed necessary to defray all necessary expenses and liabilities of such corporation," with other sections of the statute involved; and it was held that a mere resolution did not comply with the express provisions exacting an ordinance in such cases. Plainly these cases have no application to the election matter before us.

It is urged by appellant that "in order to carry the proposition of

issuing bonds for increased indebtedness over the debt limit, under subdiv. 5 of § 2678 of the Code, the same must receive enough votes to constitute a majority of all the legal voters in the city, whether voting or not." We are not concerned with the construction of § 183 of the Constitution, providing that "any incorporated city may, by a two-thirds vote, increase such indebtedness." But the assignment is based particularly upon the statute quoted, which provides that a bond issue for such purposes can only be had after "the legal voters of such city shall, by a majority vote, determine in favor of issuing such bonds." We do not pass upon this assignment, it being unnecessary to do so, holding as we do that the proposed bond issue was invalid because of fatal defect in the form of the ballot. It is unnecessary to construe this statute. There is no certainty of it being raised should an election hereafter be had upon the issuance of such bonds.

Of course the fact that this is a special election, instead of a general one, is immaterial, and makes no difference in the application of the principles of law involved. Distinctions between special and general elections concern only the steps taken in advance of the election, such as giving notice of time, place of holding, and objects of the election. As to the validity of the election held after proper notice and for lawful purposes, after authorization by the constituted authority, and regularly conducted, no distinctions can be drawn between special and general elections. Ex parte White, 33 Tex. Crim. Rep. 594, 28 S. W. 542, supra, is a decision upon a special election.

This disposes of all questions before us. Under the pleadings, upon the admitted facts and the issues of law arising therefrom, and assuming that the proof on trial on the merits will present the same facts and issues now before us, our holding would be, as it is, that the election held was valid and resulted in increasing the debt limit 3 per cent over the existing 5 per cent of indebtedness for the purpose of establishing this municipal lighting plant; but that the city council have not been authorized by the voters to incur such indebtedness for such purpose by bonding or otherwise, the election as to such bonding question being as to that invalid because of the fatal defect of uncertainty in the ballot as to the amount of bonds authorized for such purposes. Therefore the order appealed from, of date of February 5, 1912, dissolving and vacating the injunctional order pending trial and

25 N. D.—16.

final disposition of the action, should be vacated, and the injunctional order restraining the issuance and sale of the proposed bonds based upon the election had, purporting to authorize the same, should be reinstated: *Provided, however,* that such order shall not restrain the city, its council, or officials from taking steps necessary to the holding of an election at which to submit to the electors of said city the question of whether bonds in an amount certain, not exceeding the debt limit of said city as increased, shall be issued for the purpose of establishing such municipal light plant; this judgment shall not prejudice the rights of the parties in the entry of final judgment herein, except that the court shall not, after this appeal, permit the trial on the merits of new issues not within the scope of the pleadings, nor permit amendments to the pleadings to bring in other matters after the parties hereto have so stood on appeal upon the issues as so framed. Judgment will be entered accordingly. Appellant will recover judgment against defendant city for costs and disbursements on this appeal.

SPALDING, Ch. J. (dissenting). Section 183 of the Constitution prohibits the debt of any city from exceeding 5 per cent upon the assessed value of the taxable property therein, with this proviso, that any incorporated city may, by a two-thirds vote, increase such indebtedness 3 per cent on such assessed value beyond such 5 per cent limit. The same section makes all bonds or obligations in excess of the amount of indebtedness permitted thereby, void. The city of Devils Lake, having incurred indebtedness to the 5 per cent limit, and its officials, desiring to increase the debt an additional 3 per cent for an electric light plant, decided to submit it to a vote of the electors of the city. Accordingly the city council adopted a resolution intended to cover the subject and provide for a vote on the question of the increased indebtedness and the issuance of bonds therefor if it should carry. This resolution called a special election for the purpose of determining the question, and fixed the date as Monday, the 6th day of November, 1911, and provided for giving notice of such election. The council, as shown by the record, failed entirely to designate the polling places at which such election should be held. The resolution in no manner indicated that it should be called or held except as required by law, in each of the several precincts, which were the four

wards of the city. The auditor, however, in publishing the notice of election, assumed the unwarranted power to himself to fix the place for holding the election, and, instead of notifying the electors that the polling places would be the usual polling places in the precincts or the polling places theretofore established, which would continue to be such in the absence of new designations by the council, noticed it to be held at the fire hall in the city of Devils Lake, thus attempting to establish only one polling place for the four precincts; and the only votes cast in the entire city were polled at that place. I gather from the records that those persons who were the proper officials for the first ward in which the fire house was located acted as the election officials, and that the fire house was the usual polling place for that ward.

In determining the validity of the election, no question regarding the constitutionality of any statute is involved, and, to my mind, the only question is, Was it a legal election? The opinion of my brother Goss holds that it was not legally held, but that it was, nevertheless, valid, because the failure of the council to designate the places for voting, the assumption of authority on the part of the auditor to perform the duty imposed upon the council, and the wrongful designation of the polling place by him, and the casting of the vote of the entire city in one precinct through one set of officers, only amount to an irregularity. To this I cannot agree. It appears to me that a most serious and dangerous precedent is furnished by such opinion. It also seems to be in fact, though not so stated, grounded upon an assumption which is prevalent in these days among laymen, namely, that the right to vote is a natural or inherent right, and that the losing by one or a few persons of their votes is a more serious matter than the protection of the integrity and the purity of the ballot and the ignoring of means provided to that end by limitations and regulations of the exercise of the franchise. That the right to vote is not an inherent or natural right, but is conferred solely by the Constitution or laws, as the case may be, and regulated by the legislature in the interest of good order and honesty, in so far as not in conflict with the Constitution, and is but a political privilege, has been established in many states. I cite only a few of the many authorities to that effect: Chamberlain v. Wood, 15 S. D. 216, 56 L.R.A. 187, 91 Am. St. Rep. 674, 88 N. W. 109; Gougar v. Timberlake, 148 Ind. 38, 37 L.R.A.

644, 62 Am. St. Rep. 487, 46 N. E. 339; Frieszleben v. Shallcross, 9 Houst. (Del.) 1, 8 L.R.A. 337, 19 Atl. 576; People v. Barber, 48 Hun, 198; Spencer v. Board of Registration, 1 MacArth. 169, 29 Am. Rep. 582; Minor v. Happersett, 21 Wall. 162, 22 L. ed. 627; Anderson v. Baker, 23 Md. 531; Bloomer v. Todd, 3 Wash. Terr. 599, 1 L.R.A. 111, 19 Pac. 135; Cooley, Const. Law, 260; Story, Const. §§ 577–584; Black, Const. Lim. 752; 2 Bryce, Am. Com. 437; 2 Lieber, Misc. Writings, 204, 205; Blair v. Ridgely, 41 Mo. 161, 97 Am. Dec. 248.

Certain principles which to me seem well established or evident are applicable to this case. (1) Doubtful claims of power or duty, or ambiguity in the terms used by the legislature, are to be resolved against a municipal corporation. Stern v. Fargo, 18 N. D. 289, 26 L.R.A.(N.S.) 665, 122 N. W. 403. (2) In this case the bonds have not been issued, and the Constitution and statutes providing for the issuance of municipal bonds are more strictly construed in actions to prevent their issuance than in actions to prevent their payment after they have been issued and negotiated. Ibid. (3) The duties of the city auditor in issuing the notice of a special city election in which the electors are to vote upon the issuance of bonds or the increase of municipal indebtedness are purely ministerial. And such notice must follow the terms and conditions of the resolution authorizing the election. Ibid. It follows from this established proposition that the insertion, in the notice calling the election, by the auditor, of the designation of the one polling place, was wholly without authority, and rendered such designation absolutely void and of no effect. The resolution of the council did not provide for it. (4) Most authorities sustaining elections held at a place not authorized by law or by lawful authority relate to general elections. The time for general elections is fixed by law, and all electors are presumed to know when they occur, regardless of notice. For this reason many defects in the proceedings relating to general elections are disregarded by the courts which, when the same irregularities or defects relate to a special election, render the special election invalid. As a general election can only be held on a certain day fixed by law, and because such election is general throughout the state, and the loss of a vote or votes in a part of the state cannot be remedied by holding another election, the courts overlook or palliate

many irregularities. The reasons for doing this do not apply in the case of a special election to vote on one subject in the limited territory comprised in four precincts, all in one city, as the only effect of a failure to hold a valid election in such case is that the city has incurred the expense, and some voters the inconvenience occasioned by the election, and another can be called and the same question again submitted; and when a matter of as great importance to a small city as the extraordinary increase of indebtedness beyond the ordinary limit fixed by the Constitution and the statute is involved,—a question in which every taxpayer is interested, and one to which each must contribute of his substance if it carries,—the requirements of the statute should be complied with with a reasonable degree of strictness and regularity. This is especially true when the acts in question are required or prohibited, because their performance or omission has a tendency to lessen the protection intended to be afforded the public against fraud and corruption.

(5.) With these observations regarding established or self-evident principles, I proceed to consider briefly the questions that seem to me directly involved in this election. The first relates to the qualifications of an elector. The framers of the Constitution, and the people who adopted it, were mindful of the general demand existing at that time for greater protection to the ballot than had prevailed during territorial times. Stories were current of gross frauds perpetrated in the elections of the territory, and particularly in county and city elections. Many of these frauds were alleged to consist in the colonization of voters, the transportation of section crews working on railroads, into precincts, over night before election, and voting them where their votes would do the most good, the importation of men from other counties into those where the election was supposed to be close, the herding of transients in "blocks of five" or in greater numbers, in wards of cities where their votes might be needed to elect aldermen, and similar offenses against the elective franchise. In an attempt to remedy this, through the Constitution, the qualifications necessary to entitle one to vote were prescribed by article 5 of that document. This article was later amended, but not in any respect material to the case before us, and it in part now reads:

"Section 121. Every male person of the age of twenty-one years

or upwards, belonging to either of the following classes, who shall have resided in the state one year, in the county six months, and in the precinct ninety days next preceding any election, shall be . . . a qualified elector at such election:

"First.   Citizen of the United States. . . . "

That the intention was to thereby limit the exercise of the elective franchise to those citizens of the United States who had lived in the precinct, and in the county, and in the state, the periods respectively designated cannot be questioned.   Would it be contended by anyone that that provision authorizes a resident of the state of Minnesota to vote at an election in this state?   Can it, with any greater certainty, be maintained that it permits or authorizes a resident of Benson county to vote at any election in Ramsey county?   And, if not, it seems clear to me that the provision is no more liberal with reference to citizens of the United States residing in the fourth precinct of the city of Devils Lake by authorizing or permitting them to vote in the first precinct.   The same language applies to the precinct that applies to the county and the state.   An American citizen over the age of twenty-one years may be a resident of the state for more than a year and yet not entitled to vote,—that is, not be an elector,—because he has not lived in the county six months.   He may have resided in the state a year and in the county more than six months, but not have resided in the precinct ninety days, and still he is not an elector.   He fails to possess the constitutional qualifications or requirements necessary to entitle him to vote.   The use of the word "the" in each instance is identical.   It does not say *a state, a county, a precinct;* neither does it say *any state, any county,* or *any precinct;* but in each instance it says *the,* and a brief application of thought to the subject about which that section of the Constitution treats seems to me to render clear what is meant.   It is dealing with the qualifications of the elector. Those qualifications consist in citizenship and residence.   In addition to a citizenship, there must be three kinds of residence; and failing in either one of these qualifications as to residence, he is not an elector at the election at which he seeks to vote; and if he is not an elector, neither the fiat of a city council nor of a city auditor, in disobedience of law, can make him one; and while a court has the power to hold valid a vote cast by one not an elector, and sustain an election at which

presumably two thirds of the votes cast were illegally cast, yet it seems to me that, in a matter of this importance and one which it is so easy and simple to remedy by calling a legal election, any court should hesitate long before establishing a precedent of the kind established in this case. And so far as the facts ought to influence a decision, the mere fact that this election was so close that a change of four votes from the majority to the minority, or an addition of six votes to the minority, would have changed the result, calls for great care in reaching any decision that may be reached. It may be conceded that the authorities are somewhat in conflict on the subject, yet an analysis of some of them will disclose that the conflict is not as serious as might be at first thought.

The Constitution left it to the legislative assembly to define the precinct. As is shown in the majority opinion, it has done so, and each ward in a city constitutes a precinct since 1911, at all city elections. For this reason the constitutional mandate is as express and definite as though § 121 of the Constitution had in itself fixed the boundaries of every precinct in the state.

My second proposition is that, regardless of the constitutional provision, the election was held in violation of statute. The legislative assembly has provided a quite comprehensive Code for the registration of electors, the conduct of elections, and all proceedings connected therewith. Section 605, Rev. Codes 1905, is a re-enactment of the constitutional provisions as to who is entitled to vote. Section 732 designates who shall constitue the board of registry for the respective precincts, and provides for their making a list of all persons qualified to vote at the ensuing election, in such election precinct, and that such list, when complete, shall be known as the register of electors of such precinct. Section 732 requires such register to contain a list of the qualified electors of such precinct, alphabetically arranged, and that it show the residence, etc., or other location of the dwelling place of each elector, and provides regulations for the government of the board in placing names upon the register; but it nowhere provides for the insertion therein of the name of any person not a resident of the precinct for which the register is made and in which it is to be used. On the other hand, it provides for the entry thereon of the names of persons ascertained by such board, or known by them, to be qualified electors in such precinct, or

proof, to be made by the oath of the person applying to be registered, or of some other elector whose name is already on the list, and requires *the omission from such register of the names of all who have died or removed from the precinct since the last poll list was made.* It then requires that the board shall certify to copies of such register as a true list of the voters in its precinct, so far as known, and for the posting of the list in a conspicuous place where it may be accessible to any elector desiring to examine it or to make copies. Section 734 provides for the registry list in new precincts, and its provisions are in harmony with those relating to old precincts, and it comprehends the inclusion in the registry list of the new precinct of the names of persons who are known by the board to be electors in their precinct, or proved to be such by the oath of an elector whose name has already been entered upon the register, or by the oath of the applicant. To guard against fraud, § 736 provides that the proceedings of the board of registration shall be open, and that all persons entitled to vote in such precinct shall be heard in relation to corrections or additions.

Section 737 is important. It provides that it shall be the duty of such board at one of its meetings *to erase from the registry list the name of any person inserted therein who shall be proved by the oath of two legal voters of such precinct to the satisfaction of such board to be a nonresident of such precinct.* Section 738, as amended in 1911, provides for the use of the lists thus made on the day of election by the election board, and that no vote shall be received at any election in this state if the name of the person offering such vote is not on the registry list, unless such person shall furnish to the judges of election his affidavit, stating therein that he is *a resident of such precinct,* giving his place of residence, and the length of time he has resided there, corroborated by the oath of a householder and registered voter of the precinct. *To register he must prove that he is, or be known to the officials to be, a resident of the precinct in which he seeks to register; to vote he must be in the register or prove that he is such a resident.*

Section 744 makes it a felony for any person to cause his name to be registered, knowing *that he is not a qualified voter in the precinct where such registration is made,* or for any person to aid or abet another in any of the acts prohibited. Section 8600 of the Penal Code also makes it punishable by imprisonment in the penitentiary for any person to

cause his name to be registered as that of an elector upon any register, . . . knowing that he is *not a qualified voter within the territorial limits covered by such register.* Section 8597 makes it a misdemeanor for any person to knowingly vote or offer to vote in any *election precinct or district in which he does not reside* or in which he is not authorized by law to vote. To the alternative part of this section, I will refer later. Section 8594 provides a penalty for voting or offering to vote by one knowing himself not to be a qualified voter.´ Section 8628 makes it a misdemeanor for any person to vote upon any question or issue pending or submitted to any caucus or primary meeting, if´the person is not a *qualified elector of the ward or election precinct* in which such caucus or primary meeting is held.

The different sessions of the legislature which have enacted and amended primary election laws have made many of the sections above cited apply to the conduct of primaries. Section 2744, Rev. Codes 1905, as amended by chapter 66, Laws of 1911, provides that every legal voter of the county in which a city is situated, who shall have been a resident of the city ninety days next preceding a city election, shall be entitled to vote at all city elections, and requires the city council to provide for the registration of all voters in all cities of more than 400 voters as determined by the last annual election, and permits it to provide for the registration of all voters in accordance with the laws of this state at one polling place, but in such case requires separate registration lists to be provided and kept for each ward, and contains an express prohibition on *any person voting in any other place than the ward or precinct where he resides, except where otherwise provided by law.* This exception, like the one to which I have above referred to, contained in the Penal Code, has no application in the instant case, even if a valid exception, and there is no pretense that the law authorized the election to be held in the manner complained of.

In 1911, by chapter 65 of the Session Laws, § 2743 of the Revised Codes was amended so as to provide that in all cities where aldermen are not elected at large each ward shall constitute an election district, and for the division of large wards into two or more precincts for voting purposes, the consolidation of two or more small wards into one voting precinct; and it permits the council, if it so elects, in any city of less than 400 voters, as determined by the last annual election, by ordinance

to consolidate all the wards into one precinct for voting purposes, but requires, in case of such consolidation, that in city elections separate ballot boxes and poll books shall be provided and kept for each ward. It also provides that such wards and precincts shall constitute election districts for all state, county, and school elections. This law was in force when the election in question was held at the city of Devils Lake, in which there were more than 400 qualified voters. Here is an express mandate on the subject; and, in my opinion, if all the provisions to which I have made reference were eliminated except the one contained in the Constitution, and §§ 2743 and 2744, as amended in 1911, should determine this case. This election was held in direct violation, not only of the letter of the statute and of the Constitution, but in violation of the spirit and intent of all the provisions on the subject. A mere argument based on the question of convenience or the trifling expense of holding another election appears to me to be entitled to no consideration whatever. If there was no authority in law for holding such an election, it would be invalid or the law meaningless. If valid, any group of people may call an election at any time and at any place, and impose a burden upon the inhabitants of any municipality, which neither in law nor morals have they any right to impose.

It will be seen by the above citations that the legislative construction during the entire period of statehood has been to the effect that no one could vote in a precinct unless he was a resident of that precinct and had been for ninety days next preceding the election. But it is held in the majority opinion, and on this I express no opinion, that registration was unnecessary at this special election, and it may, therefore, be thought that the provisions regarding registration have no bearing upon the subject under consideration, but I think they have a marked bearing. The registration law is at least applicable to what may be called general city elections, and we are not justified in assuming that the qualifications for voters at a special city election differ from those at a general or annual city election, or one where a mayor is elected. Such an assumption would clearly be absurd.

It is held in the majority opinion that this election was merely an irregular election, and not an invalid one, because the statute does not say in express language that a violation of the constitutional provision, or a violation of the statute in regard to the place of voting, shall invalidate

the election or the votes so cast. Apply this reason to mortgage fore-closure judgments and many statutory proceedings, and how would the decisions harmonize with the one in this case? I am aware of no provision saying that most such proceedings are void for failure to comply with the statute, yet courts have never hesitated to hold them so, or at least voidable. When we take into consideration all the sections and provisions to which I have made reference, or from which I have quoted, and the express prohibitions contained in many of them, it seems to me that they are entitled to some weight, and that if it is illegal for a person to vote in a precinct of which he is not a resident, an election held in the first ward of Devils Lake, in which those qualified to vote in each of the other three wards commingled their votes with those of the first ward, is invalid, unless we can fall back on to the proposition that we do not know that the result was changed. As to this it must be remembered that the complaint in this case gives the names of twenty-one people who voted, who, it is charged, were not entitled to vote anywhere in the city. It is true that there is no allegation that they voted for the issuance of the bonds, but this is a specific charge of fraud, not necessarily on the part of the officials, but in the election, and ought to be adequate to impeach the whole election where the result is so close as I have shown it to be in this case, unless the party claiming such votes shows them legal. Neither do I think that the law applied in so many cases, requiring an allegation under oath that the votes fraudulently cast changed the result, should be adhered to in this case. When we became a state and adopted our Constitution, in addition to provisions inserted in the Constitution, there was an overwhelming public sentiment in favor of providing, either in the Constitution or by statute, for the Australian ballot, and that a secret ballot should be required. The constitutional convention, in its effort to avoid excessive legislation in the Constitution, and recognizing as a fact that the demand for the secret ballot would result in the immediate action by the legislature, omitted to make provision for it in the Constitution, but did provide for a secret ballot and for the regulation of elections. Constitution, § 129. The legislative assembly, recognizing the sentiment to which I have referred, provided for the Australian ballot. The object of this ballot is to promote the purity of elections, and to protect the elective franchise from adventurers and people seeking to promote their own selfish and unpatriotic aims. In

this respect our election system differs materially from those of several
of the other states, authorities from which have been cited in the ma-
jority opinion.   In some of those states each ballot is required to be
numbered to enable the proper officials, in case of a contest, to identify
the person who cast it; but here all provisions look to the contrary, and
the contestant is handicapped when an election is very close.   He does
not know how the twenty-one unqualified voters voted.   He has no pow-
er to ascertain.   In fact it may be doubted if he has any right to ascer-
tain, at least until the case gets into court for trial.   Presumably he
cannot ascertain how the twenty-one voted.   They may have been tran-
sients and have departed the day after the election, and it seems to me
in such a case to require him to plead something that he has no infor-
mation on, and perhaps verify it by his oath, is too exacting, particu-
larly in a case where so few votes would change the result.

Now I will review a few of the authorities cited by my brethren.
Much weight seems to be placed upon People ex rel. Lardner v. Car-
son, 155 N. Y. 491, 50 N. E. 292.   Without undertaking to pass judg-
ment as between the opinion representing the majority, namely, Judges
O'Brien, Bartlett, Haight, and Martin, and the three in minority,
namely, Chief Justice Parker, Judges Gray, and Vann, I may say that
the case is not necessarily an authority.   The Constitution of New York,
as far as material, was as follows:

"Every male citizen of the age of twenty-one years, who shall have
been a citizen for ten days, and an inhabitant of this state one year next
preceding an election, and the last four months a resident of the county,
and for the last thirty days a resident of the election district in which
he may offer his vote, shall be entitled to vote at such election in the
election district of which he shall at the time be a resident, and not else-
where, for all officers that now are or hereafter may be elective by the
people."   [N. Y. Const. art. 2, § 1.]

When the city of Lockport was chartered by legislature of New York,
the charter provided that the polling places for the town of Lockport
should be outside the boundary lines of the town and within the limits
of the city of Lockport.   At a general election the vote of the town of
Lockport was cast at polling places located within the borders of the
city, and if the votes cast at those polling places were not received it
changed the result of the election as to the superintendent of the poor

of Niagara county. A majority of the court held that the constitutional provision meant that the elector must vote at the polling place designated by law for casting the vote of the district where he resides, and that the validity of his vote is not affected by the circumstance that the polling place is by law located outside the boundary line of the district; that in such case he votes within the district of his residence within the purview of the Constitution. But in that case the polling places and the ballots, the officers and the voters, were all as separate and distinct from those of the city of Lockport as though the polling places had been within the town of Lockport. This fact clearly distinguishes it from the case at bar, and I think the doctrine of the decision might be read to be that the polling place, although located outside the boundaries of the precinct or district, becomes, for the purpose of the election, a part of the district or precinct for which it is alone used. Also in that case all fraud was expressly disclaimed in the conduct of the election, and also the casting of illegal votes. The strong dissenting opinion of Judge Vann construes and he indicates the decision to be to the effect that under the law the town election districts were projected into the city so as to embrace the polling places designated therein for the town. He says:

"No one would think of so construing the Constitution as to make it mean that a person could, for any purpose, be a resident of both city and town on the same election day, were it not for the temporary inconvenience of holding otherwise. Convenience has nothing to do with the meaning of the Constitution, which does not change in order to accommodate a community. Its broad and general rules are made for the government of the entire state, and they do not vary because a few hundred people want them to. The Constitution is not a leaden rule that bends up and down, so as to measure 12 inches when the surface is smooth and 11 when it is rough, but it is constant, uniform, and inflexible, and all must obey its commands, whether convenient or inconvenient. . . . Its words should be given their usual meaning unless the context shows a different intention, of which there is no evidence in the case in hand. . . . A strained construction of the Constitution, made to meet an emergency, is an injury to jurisprudence, for it disturbs the foundations of the law and trifles with the confidence that is reposed in the judgments of courts."

In that case the question was the constitutionality of the provision

referred to in the legislative charter of the city of Lockport, and Judge Vann truly observes: "It is better that a small proportion of the inhabitants of the state should suffer temporary inconvenience than to permit the will of the mass of the people, as expressed in the adoption of the Constitution, to be defeated by a loose construction that may invite abuses and permit disorder." In the case at bar we are not concerned with the constitutionality of any statute, but with the validity of the acts of city officials, and are required to determine whether the conceded illegality of those acts renders their result invalid.

Much reliance is also placed upon decisions from Missouri and Texas. Bowers v. Smith, 111 Mo. 45, 16 L.R.A. 754, 33 Am. St. Rep. 491, 20 S. W. 101, when the facts are considered, seems to me to have no application. In that case the election officials arranged two polling places in the precinct, in the same building, and on the same alley or portico, but about 75 feet apart, with two sets of officials. The polling places were in sight of each other. The purpose was to save confusion and expedite the conduct of the election. The large number of voters made it inconvenient to serve all in one place, and it was held that this division of the polls did not invalidate the election as to that precinct.

State ex rel. Brown v. Westport, 116 Mo. 582, 22 S. W. 888, is a case in which there were four wards in the city and an election to determine incorporation as a city was held, and the vote was all cast in one place, notwithstanding the fact that each ward was a separate election district under the law. There was no claim or pretense of fraud or unfairness, and the city had acted, for twelve years after the election, on the assumption that it was legally incorporated, and it had during all that time exercised all the prerogatives of a city, and been recognized by the public and by judicial tribunals as a city. It was held after all these things had occurred that the state may, by long acquiescence and continued recognition of a municipal corporation, through her officers, state and county, be precluded from an information to deprive it of franchise long exercised in accordance with the general law.

As to the election being irregular, a question which need not have been decided, the court simply cited Davis v. State, 75 Tex. 424, 12 S. W. 957, and one or two other authorities following that case. The Westport Case was followed in State ex rel. Canton v. Allen, 178 Mo. 555, 77 S. W. 868, but as to these decisions and all other Missouri decisions

on the subject it may be said the Constitution then in force only required a residence in the city, without reference to precinct or district. In Davis v. State, 75 Tex. 424, we have the authority on which the Missouri cases were predicated as to the election being merely irregular. In that we find a divided court, as is shown by the report of the case in 12 S. W. 957, and in 84 Tex. at page 191. But I cannot read the Davis Case as being of necessity an authority in this case. In that case the election was held in the same manner as in the case at bar, but it appears that, although the statute provided that in each incorporated city, town, or village each ward should constitute an election precinct, the voting places were fixed by a commissioners' court, and the supreme court says: "But as we construe the statute in relation to this matter, it was the intention of the legislature to impose the duty upon the commissioners' courts, of fixing the place in each county where the votes should be cast. . . . In order to comply with these requirements it is necessary for the courts to determine as a preliminary inquiry, in the first place, whether or not there is an incorporated town, village, or city in their county; and, in the second, whether or not it is divided into wards. This is a necessary incident of the duty imposed and the power conferred upon them. Having, then, the jurisdiction to determine the questions, was it intended that their decision should be subject to attack in a collateral proceeding?"

And the court proceeds to hold that, in a collateral proceeding like the one there involved, the decision of the commissioners' court had the effect of a judgment, and inasmuch as it had jurisdiction to decide whether the city was incorporated, and divided into wards, its decision was conclusive. And it held that the failure of the commissioners' court to make each ward an election precinct did not avoid the election unless it was shown that the court had acted with a fraudulent purpose. The foundation of the decision, as I read it, is that the judgment could not be attacked collaterally for an erroneous decision in a matter within the jurisdiction. I suggest the reading of the dissenting opinion of Judge Henry, published in 84 Tex. 191.

The case cited from 68 N. J. Law is like the New York case, and only applies to a polling place located independently of all others but outside the district, and in the quotation contained in the majority opinion it is significant that the New Jersey court says:

"That does not raise the question of one voter lawfully entitled to vote in his district voting at the ballot box of another district."

Peard v. State, 34 Neb. 372, 51 N. W. 828, presents facts similar to those in State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955, but the Nebraska court places the burden of proof on respondent, and holds that, in the absence of proof that the votes in question were cast by qualified voters of the district, such votes are presumptively void. I do not care to analyze more authorities cited from other jurisdictions. These are sufficiently illustrative of all.

Let us now consider some which appear to me to sustain my views. We first have the case of Territory ex rel. Higgins v. Steele, 4 Dak. 78, 23 N. W. 91, which in all respects is identical with the case at bar, except that a special county election was involved, instead of a city election. The county of Kidder was divided into three precincts. The polling places were Tappan, Dawson, and Steele, Steele being the county seat. Steele and Tappan were between 13 and 14 miles apart, with Dawson about midway between the two. A bond election was called by the commissioners, and the polling place fixed at Steele for the three precincts. The court held the election invalid. Most eminent counsel were employed on both sides, and the report of the case indicates that every authority available to sustain the election was presented. The court remarks: "In every case that has fallen under our notice it is held that when the failure to comply with such conditions and requirements tends to mislead and obstruct a full and fair exercise of the right of the elective franchise, such conditions and requirements cannot be disregarded with impunity." It finds that the conditions imposed tended to mislead and obstruct the full and fair exercise of the right of the elective franchise, and says:

"The claim that is made that these people might have voted at Steele is simply ridiculous in view of the fact that § 68, Penal Code, provides that every person who votes or offers to vote in any election district in which he does not reside is guilty of a misdemeanor." Section 68 of the Penal Code has been brought forward into our Code, and is one of the sections which I have cited.

Bean v. Barton County Ct. 33 Mo. App. 635, is directly in point. It is on all fours with the case at bar, and the election was held invalid and set aside, reversing the lower court. This case, however, was not de-

cided by the supreme court of Missouri, and no reference is made to it in the decisions of that body; whether because it was not deemed in point I cannot say. It certainly is not expressly overruled. The Constitution of Illinois is identical in effect with our own on this subject. As far as necessary to quote it reads: "Every person residing in this state one year, in the county ninety days, and in the election district thirty days next preceding any election therein, . . . above the age of twenty-one years, shall be entitled to vote at such election."

In People ex rel. Delaney v. Markiowicz, 225 Ill. 563, 80 N. E. 256, it is held that in state, county, city, and village elections the voter, in addition to all other legal qualifications, must have resided thirty days next preceding the election in the election district in which he votes.

People ex rel. Ringe v. Gochenour, 54 Ill. 123, holds that the clerk could not give legal notice of an election until the city council had acted for the purpose of determining where the election should be held. This case is directly in point on the fact that the city council of Devils Lake did not designate, in their resolution calling this special election, the polling places. The only designation made was made by the clerk. It may be argued that this is not specifically alleged as a ground for reversal, but I think the points made in the brief of appellant are broad enough to cover it, although it is not specifically argued. This fact appears clearly upon the record presented. I do not wish to be understood as resting my conclusions upon it. They are based upon more vital and important questions, but this alone should invalidate the election.

In Stephens v. People, 89 Ill. 337, it is held that it is essential to the validity of an election that it be held at the time and in the place provided by law; and that when the time and place are not fixed by law, and the election is only to be called, and the time and place fixed by some authority named in the statute, after the happening of some condition precedent, it is essential to the validity of such an election that it be called and the time and place fixed by the very agency designated by law, and none other.

In Williams v. Potter, 114 Ill. 628, 3 N. E. 729, we have a case where two voting places in the same town, which contained one precinct, were designated by the county board and the town clerk, in giving notice of the annual town election, named a schoolhouse in a certain district as the voting place for a part of the town; and it was held that in-

25 N. D.—17.

asmuch as that schoolhouse had not been designated by the county board as a polling place, the votes there cast were cast at a place unauthorized by law, and could not be counted.

Behrensmeyer v. Kreitz, 135 Ill. 591, 26 N. E. 704, is considerably in point, but the facts are too complicated to be here stated.

In People ex rel. Atty. Gen. v. Holihan, 29 Mich. 116, it is held that electors are only allowed to vote in their proper districts; that they cannot be residents of one district and at the same time be allowed to vote in some other. See also Snowball v. People, 147 Ill. 260, 35 N. E. 538. In Darragh v. Bird, 3 Or. 229, it is held that an elector may only vote for county officers in the precinct where he resides, and I commend the reasoning and the observations of the court in that opinion to the consideration of readers. In State ex rel. Bancroft v. Stumpf, 23 Wis. 630, two votes were thrown out because they were cast by persons not residing in the town in which they were cast, and the court holds that electors must vote in the town, ward, or election precinct where they reside. State ex rel. Wannemaker v. Alder, 87 Wis. 554, 58 N. W. 1045, is a case directly in point. It was an action in the nature of quo warranto to test the title to the office of county clerk. He claimed to have been elected at the general election in 1892. It appears that the voters of one precinct, to the number of forty-nine at least, voted in another precinct, although in the same county, and had they voted in their own precinct they would have been entitled to vote for a candidate for county clerk; and the court held that they were not lawful voters in the precinct in which they voted, and threw out their votes. The Constitution of Wisconsin provided that no elector should vote except in the town, ward, village, or election district in which he actually resided. The court said that the question presented was strictly one of law; that the constitutional provisions could not be compromised by any considerations of policy and convenience. In the precinct in which these voters resided no place had been provided for holding the election; and the court says on that subject that they cannot correct their own fault and neglect by being allowed to vote at the town poll at which the law gives them no right to vote. If the law has established a precinct in which only the electors can vote, then it is their duty to hold an election there, and they omit such a duty under the penalty of losing their right to vote anywhere. As to the argument,

which is likewise suggested in the case at bar, that this was a *de facto* election and the officers of the precinct where the illegal votes were cast were *de facto* officers, the court says it has no force, and that there is no argument strong enough to destroy the force of law when expressed in such clear and unequivocal language, and the violation of such a law cannot be palliated or excused. But it is argued in reference to the Constitutions of New York, Wisconsin, and some of the other states, which contain the expression, "where he offers to vote," or its equivalent, that that differentiates those cases, and makes it clearer that they may not vote outside of the precinct in which they reside, than does the language of our own Constitution and laws. I cannot assent to this doctrine. As I show in the fore part of this opinion, the Constitution and the statute read, *the state, the county,* and *the precinct.* These expressions can refer to no state, county, or precinct except this state, the county, and the precinct in which the voter resides and offers his vote, and it must mean that he must offer his vote, and that it is to be received and counted only in the precinct in which he resides.

Chase v. Miller, 41 Pa. 403, construes the Constitution of Pennsylvania, which is: "In elections by the citizens every white freeman of the age of twenty-one years, having resided in the state one year, and in the election district where he offers to vote ten days immediately preceding such election . . . shall enjoy the rights of an elector." I contend that the meaning of this provision is identical with that of our own, barring the difference in periods of residence. The court says that this provision means that the voter *in propria persona* shall offer his vote in an appropriate election district in order that his neighbors may be at hand to establish his right to vote, if challenged, or to challenge, if doubtful, and that when so understood the provision introduced not only a new test of the right of suffrage, to wit, a district residence, but a rule of voting also; that place became an element of suffrage for a two-fold purpose, and that without the district residence no man could vote, but having such residence the right it confers is to vote in that district; and that the court has no power to dispense with either the test or the rule; that the residence for ten days within the district is a part of the condition of suffrage, and putting the meaning of the constitutional provisions in its own language the court says: It

"may . . . be stated thus: Every white freeman, twenty-one years of age, having 'resided,' according to the primary meaning of that word, or according to legislative definition of it, in any 'election district' created by or under the authority of the legislature, for ten days preceding the election, shall be permitted to offer his ballot in that district."

The court also says: "Our Constitution and laws treat the elective franchise as a sacred trust committed only to that portion of the citizens who come up to the prescribed standards of qualification, and to be exercised by them at the time and place, and in the manner, prearranged by public law and proclamations, and whilst being exercised to be guarded down to the instant of its final consummation by magistrates and constables, and by oaths and penalties."

And that a law permitting electors to vote outside their precincts creates the occasion and furnishes the opportunity for abominable practices. In referring to the question of disfranchisement, which appealed in that case to the trial court very strongly, it says: "Four of the judges of this court, living in other parts of the state, find themselves, on the day of every presidential election, in the city of Pittsburgh, where their official duties take them and where they are not permitted to vote. Have they a right to charge the Constitution with disfranchising them? Is not the truth rather this,—that they have voluntarily assumed duties that are inconsistent with the right of suffrage for the time being?"

And the court, in concluding its long opinion, makes these pertinent observations: "Finally, let it be said that we do not look upon the construction we have given the constitutional amendment as stringent, harsh, or technical. On the contrary we consider it the natural and obvious reading of the instrument, such as the million would instinctively adopt. Constitutions, above all other documents, are to be read as they are written. Judicial glosses and refinements are misplaced when laid upon them. . . . But when asked to set up a construction that opposes itself to both the letter and the spirit of the instrument, and which tends to the destruction of one of our fundamental political rights—that free and honest suffrage on which all our institutions are built—this court must say, in fidelity to the oaths we swore, that it cannot be done."

In direct line with this authority is Re McNeill, 111 Pa. 235, 2 Atl. 341.

It seems as though these decisions are enough to indicate that the place of holding elections is of the substance, and that a material variation from the place, and particularly when the change deprives electors of a precinct of their rightful officers, and compels them to commingle their ballots in the same box with those of several other precincts, is of the substance; that the statutory provisions are mandatory, and not simply directory, and that it is something more than an irregularity. Time and place have almost universally been held to be of the substance in an election. See Johnstone v. Robertson, 8 Ariz. 361, 76 Pac. 465; Heyfron v. Mahoney, 9 Mont. 497, 18 Am. St. Rep. 759, 24 Pac. 93; Melvin's Case, 68 Pa. 338; Russell v. McDowell, 83 Cal. 70, 23 Pac. 183; Satterlee v. San Francisco, 23 Cal. 315; Stephens v. People, 89 Ill. 337; Payne, Elections, § 327; McCrary, Elections, §§ 153, 158, 161, 176 and 228.

After considering all these authorities, it may be well to revert to decisions of our own court. Two cases have recently been decided which appear to me to be decisive and to uphold the conclusion that this election was invalid. It was held in Elvick v. Groves, 17 N. D. 561, 118 N. W. 228, and in State ex rel. Johnson v. Ely, 23 N. D. 619, 137 N. W. 834, that the change of a polling place by the voters invalidated the votes cast in the precinct in which the voting place was so changed. In the majority opinion an attempt is made to distinguish these authorities, and to show that the principles there announced are not applicable in the case at bar. I am unable to distinguish them. If the people who themselves are doing the voting may not ordinarily change the polling place to another place within the same precinct, because not authorized by law so to do, I cannot see how the city auditor or the city council may change the polling place of several precincts to one outside the respective precincts. They are not authorized to make such a change, and the principle involved does not relate to the individual who makes the change, but in both cases is that the change is made without authority of law, and this is what renders the votes so cast invalid and void. But it is said that the whole question is settled in State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955. It ought to be sufficient to call attention to the

fact that in that case the court granted the motion to quash the writ because, as found, it did not have original jurisdiction. This rendered all that it said on the merits *obiter*. In that case there was a conflict between the precincts established by the city council and those by the county commissioners within the limits of the city of Bismarck. If the wards were the precincts, it threw parts of some wards into each of different county commissioners' districts, and the commissioners districted the city in harmony with the commissioners' districts. It will thus be seen that a very practical proposition was presented, and that this impressed the court very strongly, as appears by a perusal of page 339. But, as I read the decision, it does not appear that any person desiring to vote at that election was, by the act of the commissioners, required to vote outside the ward in which he resided. The decision on the question of the irregularity or invalidity of the election was all made to hinge on the fact that it was an original application made to this court, and it expressly states that the merits of the action would be for the determination of the district court. The question of the validity of this election is the important question in this case. It is important to the residents of Devils Lake, but of far greater importance to the people of the state and to the courts for future guidance. No question of disfranchisement is involved, as might be in case of a general election, because, as I have indicated, the question will still be open for a proper submission to the electors of the city. Custom is not an element. It is alleged that all special elections in the city have been held at one place only; but there is no allegation or proof of the number or dates of such elections, and as far as we know they may have been held when only one polling place was required by statute.

It may be that the election should have been called by ordinance, rather than resolution; but, as this is of minor importance, I will express no opinion thereon, nor upon other questions involved.

There is one theory on which the judgment of the district court might possibly be affirmed. The record contains enough to indicate that the plaintiff is seeking to vindicate a personal property right, rather than a right incident to citizenship; that the action is in fact brought to prevent the city of Devils Lake furnishing its own lights, to the detriment of the existing private plant operating in that city. Assuming this to be so, was it not the duty of the plaintiff to have proceeded,

on discovering the illegality of the election proposed, to prevent the holding of the election or to seek the correction of the procedure? Should the plaintiff be allowed to stand by and take the chances of a favorable result, and then, after having done so, the result being unfavorable, be permitted to set it aside? It must be borne in mind that this is not an action in the name of the state on the relation of a citizen, but is an action by an individual, one apparently seeking to vindicate a private property right only. I cannot resist the conclusion that the announcement of the law by the majority of the court in this case is erroneous.